371 F.3d 663
 Richard A. LEAVITT, Petitioner-Appellee,
v.
Arvon J. ARAVE, Warden, Idaho State Correctional Institution, Respondent-Appellant.
Richard A. Leavitt, Petitioner-Appellant,
v.
Arvon J. Arave, Warden, Idaho State Correctional Institution, Respondent-Appellee.
 No. 01-99008.
 No. 01-99009.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 10, 2003.
 Filed June 14, 2004.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED L. LaMont Anderson, Deputy Attorney General, Capital Litigation Unit, Boise, ID, for the respondent-appellant/cross-appellee.
 David Z. Nevin, Nevin, Herzfeld, Benjamin & McKay, LLP, Boise, ID; Andrew H. Parness (argued), Ketchum, ID, for the petitioner-appellee/cross-appellant.
 Appeal from the United States District Court for the District of Idaho; B. Lynn Winmill, District Judge, Presiding. D.C. No. CV-93-00024-S-BLW.
 Before: KOZINSKI, FERNANDEZ, and RYMER, Circuit Judges.
 PER CURIAM:
 
 
 1
 Richard A. Leavitt, a State of Idaho prisoner under sentence of death, brought a petition for habeas corpus in the district court. 28 U.S.C. § 2254. He filed a myriad of attacks on his conviction and sentence, ranging from alleged evidentiary errors through instructional errors and onto attacks on the Idaho death penalty scheme. He also asserted ineffective assistance of counsel. The district court granted habeas corpus relief on one claim: the assertion that a burden of proof instruction violated Leavitt's due process rights. However, it denied relief as to all of his other claims.
 
 
 2
 The State of Idaho appeals the former, and Leavitt appeals the latter. We reverse as to the former, affirm as to all of the latter, with the exception of an ineffective assistance of counsel claim, and remand for further proceedings.
 
 BACKGROUND
 
 3
 In the small town of Blackfoot, Idaho, on July 17, 1984, the victim of this brutal crime, Danette Elg, was viciously attacked in her own bedroom by a knife-wielding assailant. The relentless and merciless assault took place on her waterbed and with such implacable force that the bed itself was punctured and torn, while the victim sustained numerous cuts and slashes as she fought for her life. She was also stabbed multiple times: One thrust caused the knife to enter her right lung, another the right side of her heart, still another her left lung, and others penetrated her stomach, her chest cavity, and her neck. One even went through her eye and into her brain. Another exceedingly peculiar and unique wound inflicted during this attack was a cut made by the attacker through which he then removed her sexual organs. He did that in a manner that showed that he had some knowledge of female anatomy, for it was done in a manner that is difficult to accomplish.
 
 
 4
 The evidence pointing to Leavitt was powerful, if circumstantial — he was not caught redhanded, nor did he confess. Unfortunately, the victim's body was not found for several days which caused the destruction of some evidentiary markers, but gave rise to others.
 
 
 5
 On the night of July 16, the victim had been severely frightened and shaken when a prowler tried to enter her home. She called the emergency 911 number and the police came, but they found nothing other than signs of attempted entry and a petrified young lady, who thought that Leavitt was the culprit. They then searched the area and the town but, alas, failed to find Leavitt. Strangely enough, during the period between the murder and the discovery of the body with Leavitt's help, he became exceedingly "interested" in the victim's whereabouts. He finally obtained permission to enter the house with the police and discovered the body. Another strange aspect of the case was that a person supposedly named Mike Jenkins also called the police a couple of times during that period and showed knowledge of details of the crime that only the killer himself would know. Mike Jenkins was not known in Blackfoot and was not heard of thereafter. Leavitt, however, is adept at disguising his voice on the telephone, and could even fool his own wife when he did so.
 
 
 6
 What else? On the very night of the killing, Leavitt suffered a severe cut to his finger, for which he was treated in an emergency room. The killer was also wounded and left behind his blood — Type O — which was mixed with the blood of his hapless victim — Type A. Of all the possible suspects, the only likely source of the Type O blood was Leavitt himself.
 
 
 7
 How could that damning connection be explained? Well, said Leavitt, he had somehow cut his hand on a fan at home — a story that was shown to be a lie. At trial he changed that to a story that he had really sustained the cut while preventing his wife from committing suicide. And the crime scene blood? Leavitt could not, at first, imagine how his blood could have been found there, but he had an epiphany by the time of trial. At trial, he managed to recall that a week before the killing he had a nosebleed in the victim's bedroom. That, supposedly, resulted in his blood being mixed with hers when she was killed on her bed a week later. It also supposedly explained how his blood was elsewhere in her room — on the walls and at the window, and even on her underclothes — he wiped his nose on them — as well as on shorts that she had worn between the date of the "nosebleed" and the date of her death. Along the way, Leavitt also tried to send his wife a letter from jail in which he sought to have her memorize a story he had concocted, which would, not surprisingly, tend to exculpate him.
 
 
 8
 Neither the jury, nor any court which has since reviewed the evidence in this case, has been impressed with Leavitt's stories. The jury found him guilty, and an Idaho judge sentenced him to death. The Idaho Supreme Court affirmed and denied post-conviction relief.[1] But the district court found error in the jury instructions and issued the writ of habeas corpus, and these appeals followed.
 
 STANDARD OF REVIEW
 
 9
 The district court had jurisdiction pursuant to 28 U.S.C. § 2254. We have jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253(c).
 
 
 10
 We review the district court's decision to grant or deny a petition for habeas corpus de novo. Martinez-Villareal v. Lewis, 80 F.3d 1301, 1305 (9th Cir.1996). "To the extent it is necessary to review findings of fact made in the district court, the clearly erroneous standard applies." Silva v. Woodford, 279 F.3d 825, 835 (9th Cir.2002). As usual, clear error review is "significantly deferential," and "we must accept the district court's factual findings absent a `definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. Syrax, 235 F.3d 422, 427 (9th Cir.2000)). Further, "[a]lthough less deference to state court factual findings is required under the pre-AEDPA law which governs this case, such factual findings are nonetheless entitled to a presumption of correctness unless they are `not fairly supported by the record.'" Id. (quoting Bean v. Calderon, 163 F.3d 1073, 1087 & n. 3 (9th Cir.1998)). Finally, we "may affirm on any ground supported by the record even if it differs from the rationale of the district court." Martinez Villareal, 80 F.3d at 1305. Because the First Amended Habeas Corpus petition was filed before April 24, 1996, the Antiterrorism and Effective Death Penalty Act does not apply to this case. See Reutter v. Crandel, 109 F.3d 575, 577 (9th Cir.1997).
 
 DISCUSSION
 
 11
 While we are faced with numerous issues, if the district court properly granted habeas corpus on the innocence instruction issue, the others fall by the wayside. Thus, we will first take up the state's appeal of the decision of that issue. We will thereafter consider the others.
 
 I. THE INNOCENCE INSTRUCTION
 
 12
 The state argues that the district court created a new rule of law in violation of Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), when it concluded that instruction 12 unconstitutionally lowered the state's burden of proof. Leavitt responds that the state waived reliance on Teague, miscalculated the date of finality, and overlooked the fact that the controlling opinion of the United States Supreme Court is In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) — decided almost fifteen years before this case arose. Thus, in his view, the principle that he advocates (and that the district court adopted) is neither a new rule nor otherwise exceptionable because there is a reasonable likelihood that the jury understood the instructions as a whole to allow conviction based on proof less demanding than proof beyond a reasonable doubt.
 
 
 13
 If a state properly argues that the district court granted a habeas petition on the basis of a new rule of constitutional law that is Teague-barred, we must address the Teague issue first. Caspari v. Bohlen, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994); Horn v. Banks, 536 U.S. 266, 267, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (per curiam). Here, the state has not waived the issue and so we should conduct a Teague analysis. This means that we must determine when Leavitt's conviction became final; survey the legal landscape at that time to see whether the rule he advocates was dictated or compelled by existing precedent; and if not, consider whether that relief falls within one of two exceptions to nonretroactivity on habeas review. See Lambrix v. Singletary, 520 U.S. 518, 527, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (summarizing steps).
 
 
 14
 * Whether the rule is "new" depends upon whether it was dictated by controlling precedent at the time when Leavitt's conviction became final in 1989, not when his sentence became final in 1992. This is because the guilt phase and sentencing phase were bifurcated, Gretzler v. Stewart, 112 F.3d 992, 1004 (9th Cir.1997), and 1989 is when the Idaho Supreme Court rendered its guilt-phase decision and the time for petitioning for certiorari had passed. United States v. Colvin, 204 F.3d 1221, 1224 (9th Cir.2000), is not to the contrary because it involved the finality of a judgment for purposes of the statute of limitations under 28 U.S.C. § 2255. By contrast, in the context of collateral review of a bifurcated decision, finality should be measured from the time when the decision under review — be it the conviction or the sentence — was actually made because the whole purpose of Teague is to "validate[] reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." O'Dell v. Netherland, 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997) (internal quotation marks omitted); see also id. ("[W]e will not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court."); Graham v. Collins, 506 U.S. 461, 468, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993); Saffle v. Parks, 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (instructing that we survey the legal landscape as it then existed to "determine whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution").
 
 B
 
 15
 The rule that Leavitt advocates, and that the district court adopted, is that there was a reasonable likelihood that the jury understood the instructions as a whole to allow conviction based upon proof less demanding than proof beyond a reasonable doubt. En route, Leavitt argues (and the district court held) that instruction 12 is erroneous because it eroded the reasonable doubt standard by allowing the jury to convict if it believed that he was "in fact" guilty.
 
 
 16
 The principle that the Due Process Clause requires proof of guilt beyond a reasonable doubt was established in Winship. And the principle that an instruction may not shift the burden of proof or lift it by a presumption as to an element of the crime charged was established in Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). However, the principle upon which Leavitt (and the district court) rely for habeas relief — that there was a reasonable likelihood that the jury interpreted the instructions as a whole to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause — was established in Cage v. Louisiana, 498 U.S. 39, 41, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) (per curiam).[2] Cage pretty clearly created a new rule. See, e.g., Tyler v. Cain, 533 U.S. 656, 665, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001) (noting the habeas petitioner's concession to this effect); Victor v. Nebraska, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994) (acknowledging that only in Cage had the Court held that a definition of reasonable doubt violated the Due Process Clause); see also Tillman v. Cook, 215 F.3d 1116, 1122 (10th Cir.2000) (holding that a habeas petitioner who was convicted in the 1980s, and who argued on habeas that his jury instruction misdefined reasonable doubt, was necessarily seeking a "new rule" because Cage was decided after he was convicted); Gaines v. Kelly, 202 F.3d 598, 602-03 (2d Cir.2000) (observing that it was not until 1990 in Cage that the Supreme Court first held that a state trial court's definition of reasonable doubt violated constitutional due process, and thus holding that Cage announced a new rule within the meaning of Teague). Therefore, Leavitt seeks the benefit (and the district court gave him the benefit) of a "new" rule, as Cage was issued after Leavitt's conviction became final.
 
 
 17
 Existing precedent did not "dictate" or "compel" the conclusion that there was a reasonable likelihood that the jury interpreted the instructions to allow for conviction by proof less than proof beyond a reasonable doubt. Reasonable jurists in 1989 would have known that a flawed instruction must be viewed in the context of the instructions overall. See Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). Reasonable jurists assessing the overall effect of Leavitt's jury charge would have realized that it contained numerous individual instructions that correctly defined reasonable doubt and stressed the importance of finding every element beyond a reasonable doubt based solely on the evidence presented at trial.[3] And reasonable jurists would have been aware that the Supreme Court had never held that an instruction like instruction 12 was erroneous, let alone constitutionally so — either by itself, or in combination with other instructions on the burden of proof.
 
 
 18
 A good argument can be made that we should start and stop with the law as determined by the Supreme Court. See Bell v. Hill, 190 F.3d 1089, 1093-97 (9th Cir.1999) (Rymer, J., dissenting). A Teague analysis applies to Supreme Court decisions, see Lambrix, 520 U.S. at 538, 117 S.Ct. 1517, and the state courts of Idaho were (and are) not bound to follow Ninth Circuit law. However, we have held that "circuit court holdings suffice to create a `clearly established' rule of law under Teague." Belmontes v. Woodford, 350 F.3d 861, 884 (9th Cir.2003) (citing Bell). Regardless of whether this view is right or wrong, it is law by which we are bound. It is also true that while the Supreme Court typically refers to its own prior cases in conducting a Teague analysis, see, e.g., Caspari, 510 U.S. at 391, 114 S.Ct. 948; Graham, 506 U.S. at 466-77, 113 S.Ct. 892; O'Dell, 521 U.S. at 160-64, 117 S.Ct. 1969; Saffle, 494 U.S. at 489-94, 110 S.Ct. 1257, the Court does not ignore "the experience of the lower courts" as illuminating whether the rule contended for is a development in the law over which reasonable jurists could disagree. See, e.g., Lambrix, 520 U.S. at 538, 117 S.Ct. 1517; Caspari, 510 U.S. at 393-95, 114 S.Ct. 948; Stringer v. Black, 503 U.S. 222, 236-37, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); Butler v. McKellar, 494 U.S. 407, 415, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990). So circuit holdings need to be (or at minimum, can be) considered.
 
 
 19
 We had held before Leavitt's conviction was final that instructing a jury that the presumption of innocence is not intended to aid the guilty-in-fact was "prejudicial error." Reynolds v. United States, 238 F.2d 460, 463 (9th Cir.1956). However, we did not hold that the instruction was constitutional error. As the Supreme Court has made clear, it is not enough that an instruction is "undesirable, erroneous, or even `universally condemned'" — it must have violated some constitutional right. Estelle, 502 U.S. at 72, 112 S.Ct. 475 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). In addition, Reynolds was decided on direct appeal, which means that it did not determine how a reasonable jury likely interpreted the charge, and it considered the challenged instruction in isolation rather than in the context of the instructions as a whole. Thus, Reynolds says nothing about whether the prejudice from a similar instruction can be cured by other instructions. Reasonable jurists could have interpreted the law to allow this, as the Second Circuit did in United States v. Doyle, 130 F.3d 523, 539 (2d Cir.1997), and as we did in Shaw v. United States, 244 F.2d 930 (9th Cir.1957). In Shaw, we upheld a conviction despite the fact that the trial court had given substantially the same instruction as in Reynolds. We reaffirmed our previous disapproval of the instruction, but held that "we are not bound to reverse in every case where the instruction may have been given." Id. Accordingly, it was evident in 1989 that we disapproved an individual instruction similar to instruction 12, but this does not dictate a conclusion that Leavitt's jury likely interpreted their set of instructions to allow for conviction on proof less than beyond a reasonable doubt. Therefore, assuming that our circuit decisions are appropriately part of the mix that reasonable jurists would have considered in 1989, and that they may have "inform[ed], or even control[led] or govern[ed], the analysis" that we would have applied to a case such as Leavitt's, Saffle, 494 U.S. at 491, 110 S.Ct. 1257, reasonable jurists in 1989 would still not have felt compelled by Reynolds and Shaw to find that instruction 12 was constitutional error that automatically required reversal without regard to the entire package of instructions and the record as a whole.
 
 
 20
 Other federal courts of appeals had considered similar instructions, but no consensus had emerged by 1989. Compare Gomila v. United States, 146 F.2d 372, 373 (5th Cir.1944) ("The statement that the presumption of innocence `was not intended, nor has it ever been intended, as extending an aid to one, who in fact is guilty ...'" is not a correct statement of the law.), and United States v. Bridges, 499 F.2d 179, 186 (7th Cir.1974) (objectionable to state that "reasonable doubt" is not for the purpose of "permitting guilty men to escape"), with Moffitt v. United States, 154 F.2d 402, 404-05 (10th Cir.1946) (finding nothing in instruction that "the presumption of innocence was `not intended to shield those who are actually guilty'" from which it could be inferred that the presumption does not benefit the guilty defendant as well as the innocent), and United States v. Farina, 184 F.2d 18, 20-21 (2d Cir.1950) (instruction that the presumption of innocence "was not intended as a bulwark behind which the guilty might hide" would not "lead a jury to suppose the presumption could not be invoked until a defendant had dispelled proof of his guilt"). Therefore, assuming that this universe of case law counts for purposes of Teague, a 1989 Idaho state court would not have felt compelled to conclude that there was a reasonable likelihood that Leavitt's jury understood the charge as a whole to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.[4]
 
 
 21
 State-court decisions (assuming they have some relevance as a reference point for determining what federal law was established at the time) were split as well. Compare Gilleylen v. State, 255 So.2d 661, 664 (Miss.1971) (reversible error to give instruction that the "presumption of innocence ... is not intended to shield from punishment anyone who is in fact guilty"), with State v. Farnsworth, 51 Idaho 768, 10 P.2d 295, 299 (1932) (upholding essentially the same instruction given in this case, and in State v. Gilbert, 8 Idaho 346, 69 P. 62, 64 (1902)). Since 1989 two state courts have rejected a constitutional challenge to a similar instruction, which indicates that the instruction was not regarded as unacceptable in those states as of 1989. See Sipress v. State, 562 N.E.2d 758, 762 (Ind.Ct.App.1990) (noting that an instruction that "the presumption of innocence and requiring the state to establish beyond a reasonable doubt, every material fact... is not intended to shield those who are actually guilty" was approved by the Indiana Supreme Court in Heald v. State, 492 N.E.2d 671 (Ind.1986)); State v. Schiappa, 248 Conn. 132, 728 A.2d 466, 486 (1999) (disapproving, but rejecting a constitutional challenge to, an instruction that "the principle requiring the state to establish guilt beyond a reasonable doubt is a `rule of law ... made to protect the innocent and not the guilty'" (omission in original)).
 
 
 22
 In sum, jurists in 1989 considering Supreme Court, circuit, and state court precedent would not have felt compelled to hold that Leavitt's jury convicted him on a diluted burden of proof solely because some courts had disapproved instruction 12.
 
 
 23
 Even so, Leavitt contends that the other reasonable doubt instructions were themselves fraught with error, such that they could not undo the misleading impression left by instruction 12. In particular, he faults instructions 10, 11, 13, 36 and 39,[5] which he claims (and the district concluded) were confusing, ambiguous, and possibly misleading to the jury. We disagree. The trial judge unequivocally told the jury at least nine times that the prosecution had the burden of proving the crime beyond a reasonable doubt. Set against these correct admonitions, existing precedent did not compel the conclusion argued for by Leavitt (and accepted by the district court) that, taken as a whole, the giving of instruction 12 created a reasonable likelihood that the jury interpreted the instructions as allowing Leavitt to be convicted on proof less than beyond a reasonable doubt.
 
 
 24
 Whatever error there was in instruction 10 was immediately cured. To the extent that the judge's statement at the beginning of this instruction that the jury "should" require proof beyond a reasonable doubt may have misstated the obligation,[6] the judge immediately followed up by explaining that if "you entertain a reasonable doubt of the truth of any one of these material allegations, then it is your duty to give the Defendant the benefit of such doubt and acquit him," and by summing up with the unequivocal statement: "There must be proof beyond a reasonable doubt." Thus, even if a layperson would have understood "should" as precatory rather than mandatory, any such impression was promptly corrected. Cf. Boyde v. California, 494 U.S. 370, 381, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (cautioning against "technical hairsplitting" of jury instructions).
 
 
 25
 Instruction 11 is virtually identical to the reasonable doubt instruction upheld in Victor v. Nebraska, 511 U.S. 1, 7, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994), that also defined reasonable doubt in terms of "moral evidence," "moral certainty," and "not a mere possible doubt." Cf. Cage, 498 U.S. at 41, 111 S.Ct. 328 (holding unconstitutional a differently worded instruction that used the terms "grave uncertainty," "actual substantial doubt," and "moral certainty," and that was not surrounded by other, correct instructions that gave content to those terms). Instruction 13 is and always has been a perfectly correct statement of the law; the prosecution need not prove every fact in the case beyond a reasonable doubt so long as it proves every element beyond a reasonable doubt. See, e.g., Harris v. United States, 536 U.S. 545, 549, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (explaining that "not all facts ... are elements," and that such facts "are thus not subject to the Constitution's indictment, jury, and proof requirements"). And instruction 36 would not have left jurors confused about their duty to acquit if they entertained a doubt that was reasonable rather than derived from "fanciful suppositions" or "remote conjectures as to possible ... facts different from those established by the evidence." Cf. Victor, 511 U.S. at 5, 114 S.Ct. 1239 ("[T]he Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof."). But cf. State v. Holm, 93 Idaho 904, 478 P.2d 284, 287-88 (1970) (disapproving this instruction, but declining to hold it unconstitutional).
 
 
 26
 Instruction 39 is more troublesome because it imposed the burden of proving an alibi on Leavitt, which is clearly wrong. See Thomas v. United States, 213 F.2d 30, 33-34 (9th Cir.1954) (citing cases from six circuits to this effect). However, it is not reasonably likely that this instruction, as part of the package of instructions, caused Leavitt's jury to base his conviction on a degree of proof below that required by the Due Process Clause. Instruction 39 by its terms pertained only to the alibi defense; the jury was otherwise clearly instructed that the prosecution had the burden of proving that Leavitt committed murder beyond a reasonable doubt, and that "the law never imposes upon a Defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence." There is no question that Leavitt had to be at Elg's house on the evening of July 17, 1984, to commit the crime. In other words, Leavitt's presence there was more or less the flip side of the prosecution's burden to show that it was he who did it. To this extent the instructions have some internal inconsistency and could allow a jury to misunderstand the prosecution's burden. Cf. Stump v. Bennett, 398 F.2d 111, 121-22 (8th Cir.1968) (a flawed alibi instruction can undermine a jury's understanding of reasonable doubt). But it is not reasonably likely that this jury did misunderstand the burden of proof, or that instruction 39 contributed to any confusion about the burden of proof required to convict, for two reasons. First, assuming there was any misunderstanding, it would extend only to Leavitt's obligation to come forward with evidence to create a reasonable doubt; it would not extend to the government's burden of persuasion. Instruction 39 did not impose any burden upon Leavitt himself to persuade the jury that he was not present beyond a reasonable doubt, or by a preponderance of the evidence. The instruction simply said (albeit infelicitously) what jurors would figure anyway, that the defendant — who would know where he was if he asserted an alibi — would be expected to produce some evidence that he was somewhere other than the scene of the crime. If believed, that evidence would create a reasonable doubt that Leavitt did it. Second, for all practical purposes, there was no alibi. Leavitt testified that he was at home watching television when Elg was murdered, yet neither his wife nor anyone else corroborated this story. He was severely impeached by having lied about cutting his finger on a fan, and by a letter that he wrote in jail making up a time-line for his wife to memorize. Most damning of all, Leavitt's blood was mixed with the victim's blood, for which there is no rational explanation other than that he was there when she spilt it. Therefore, in this case, imposing on Leavitt the burden of creating reasonable doubt of his guilt, by supporting an alibi, could have played no significant role in the jury's understanding of the requirement that it find guilt beyond a reasonable doubt.
 
 
 27
 Accordingly, reasonable jurists in 1989 would not have felt compelled to hold that, on account of instruction 12 in the context of the instructions as a whole, there was a reasonable likelihood that the jury interpreted the instructions to allow conviction by proof less than beyond a reasonable doubt. Because it would be a new rule to decide so now, we must determine whether it should nevertheless apply retroactively to Leavitt's case. If not, there is no need to consider Leavitt's remaining argument that structural error — which a Cage error is[7] — precludes harmless error analysis even on habeas review.
 
 C
 
 28
 Under Teague, "a new rule can be retroactive to cases on collateral review if, and only if, it falls within one of two narrow exceptions to the general rule of nonretroactivity." Tyler v. Cain, 533 U.S. 656, 665, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001). One is for determinations that private conduct is beyond the power of the state to proscribe; the other, which is the relevant exception here, is for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Id. (internal quotation marks omitted). To fall under the "watershed" exception, a new rule must meet two requirements: "[1] Infringement of the rule must seriously diminish the likelihood of obtaining an accurate conviction, and [2] the rule must alter our understanding of the bedrock procedural elements." Id. (emphasis and internal quotation marks omitted).
 
 
 29
 Whether the district court announced (or we would be announcing if we affirmed) a "watershed" rule by holding that the jury charge given at Leavitt's trial was unconstitutional under Winship and Cage is an open question in the Ninth Circuit. In Ramirez v. Hatcher, 136 F.3d 1209 (9th Cir.1998), the habeas petitioner argued that the reasonable doubt instruction given at his trial was unconstitutional in light of Cage, but we bypassed the state's Teague argument and upheld the challenged instruction on the merits.[8] We also considered a similar question in Harmon v. Marshall, 69 F.3d 963, 967 (9th Cir.1995) (per curiam), where we held that a habeas petitioner could benefit retroactively from an erroneous instruction that failed to define any elements of the charged crime. But Harmon does not shed light on the distinct question of whether Cage is a "watershed" rule.
 
 
 30
 Although we have never decided whether to apply Cage retroactively on habeas review, six other circuits have and they all concluded that Cage announced a watershed rule primarily on the footing that Sullivan held that a Cage error is structural error.[9] See Tillman v. Cook, 215 F.3d 1116, 1121-22 (10th Cir.2000) (relying on Sullivan and holding "[l]ike the Second, Third, Fourth, Fifth, and Eleventh Circuits, ... that the remedy for an unconstitutional reasonable doubt instruction must be applied retroactively"); West v. Vaughn, 204 F.3d 53, 55, 61 (3d Cir.2000) (Sullivan left no doubt that Cage retroactively applies to habeas petitions), overruled by Tyler, 533 U.S. 656, 121 S.Ct. 2478, 150 L.Ed.2d 632; Gaines v. Kelly, 202 F.3d 598, 604-605 (2d Cir.2000) (relying on Sullivan and concluding that, "because any criminal conviction rendered pursuant to an unconstitutional definition of reasonable doubt is necessarily unfair, ... the rule advanced by Gaines falls within the second exception to the Teague doctrine") (citation omitted); Humphrey v. Cain, 138 F.3d 552, 553 (5th Cir.1998) (en banc) (adopting the reasoning of Humphrey v. Cain, 120 F.3d 526, 529 (5th Cir.1997), that Sullivan "made it plain that Cage-Victor errors fit with the second Teague exception"); Adams v. Aiken, 41 F.3d 175, 178-79 (4th Cir.1994) (Adams IV) (in light of Sullivan, "the rule that a constitutionally deficient reasonable doubt instruction violates the Due Process Clause satisfies Teague's second exception"); Nutter v. White, 39 F.3d 1154, 1157 n. 5, 1158 (11th Cir.1994) (prior view of two circuits that Cage did not have retroactive effect on collateral review "does not survive Sullivan"). See also Tyler, 533 U.S. at 671-72, 121 S.Ct. 2478 (Breyer, J., dissenting) (explaining why "[t]o reason as the Court reasoned in Sullivan is to hold (in Teague's language) (1) that infringement of the Cage rule `seriously diminish[es] the likelihood of obtaining an accurate conviction,' and (2) that Cage `alter[s] our understanding of the bedrock procedural elements' that are essential to the fairness of a criminal trial") (internal citations omitted) (alteration in original); Ramirez, 136 F.3d at 1216 (Reinhardt, J., dissenting) (concluding that "[t]he Supreme Court's unanimous decision in [Sullivan] leaves no doubt that the Cage rule meets this standard").
 
 
 31
 Ordinarily, the unanimity of six circuits on a question of first impression for us would counsel against our reaching a contrary result. Cf. Zimmerman v. Oregon Dep't. of Justice, 170 F.3d 1169, 1184 (9th Cir.1999) ("We realize that our decision creates an inter-circuit split of authority. [W]e are hesitant to create such a split, and we do so only after the most painstaking inquiry...."). However, there is a compelling reason to do so here. These decisions were all reached between 1994 and 2000 — after Sullivan had held that Cage error is structural, but before the Court indicated in Tyler that "a holding that a particular error is structural does not logically dictate the conclusion that the second Teague exception has been met." Tyler, 533 U.S. at 666-67, 121 S.Ct. 2478. In light of Tyler, pre-Tyler circuit authority to the contrary is no longer persuasive.
 
 
 32
 Considering the issue afresh, it is clear that the first "watershed" requirement is met because a defective reasonable doubt instruction affects the accuracy of the finding of guilt beyond a reasonable doubt. Indeed, it destroys it. Misdescribing the burden of proof "vitiates all the jury's findings," has "consequences that are necessarily unquantifiable and indeterminate," and transforms appellate review into "pure speculation." Sullivan, 508 U.S. at 281-82, 113 S.Ct. 2078. In short, when a Cage error is committed, "a criminal trial cannot reliably serve its function." Id. at 281, 113 S.Ct. 2078. From this it necessarily follows that a defective reasonable doubt instruction seriously decreases the likelihood of obtaining an accurate conviction. Cf. Gaines, 202 F.3d at 604 ("[I]t logically follows [from Sullivan] that the reasonable doubt rule flowing from Cage plays a pivotal role in ensuring the accuracy of the findings that underlie any criminal conviction rendered by a jury.").
 
 
 33
 However, we now know that it does not necessarily follow from Sullivan that the Cage rule alters our understanding of bedrock procedures. Tyler, 533 U.S. at 666-67 & n. 7, 121 S.Ct. 2478. The second Teague exception is reserved for only a "small core of rules," Graham, 506 U.S. at 478, 113 S.Ct. 892, that can truly be categorized as "groundbreaking." Caspari, 510 U.S. at 396, 114 S.Ct. 948. The "watershed" exception does not apply to every rule that promotes accuracy and guarantees due process. Cf. Tyler, 533 U.S. at 667 n. 7, 121 S.Ct. 2478 ("Nor can it be said that all new rules relating to due process (or even the `fundamental requirements of due process' ...) alter such understanding."). Indeed, in the thirteen years since Teague was decided, the Supreme Court has never found that any rule falls within the "watershed" exception despite at least eleven opportunities to do so. See United States v. Mandanici, 205 F.3d 519, 529 (2d Cir.2000) ("Beginning with the rule at issue in Teague, the Court has measured at least eleven new rules, or proposed new rules, of criminal procedure against the criteria for the second exception and, in every case, has refused to apply the rule at issue retroactively."); see also United States v. Sanchez-Cervantes, 282 F.3d 664, 669 n. 23 (9th Cir.2002) ("[T]he Supreme Court has not found any rule to qualify under the second exception since Teague came out."). But cf. Saffle, 494 U.S. at 495, 110 S.Ct. 1257 (indicating that the guarantee of counsel in criminal trials established by Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), is an example of the type of rule that would fall within Teague's second exception). And in 2001, in Tyler, the Court reiterated that "it is unlikely that any of these watershed rules ha[s] yet to emerge." Tyler, 533 U.S. at 667 n. 7, 121 S.Ct. 2478 (citation and internal quotation marks omitted) (alteration in original). It follows that it is "unlikely" that Cage is a watershed rule.
 
 
 34
 Accordingly, even if we were to hold that instruction 12 and the instructions as a whole were unconstitutional in light of Cage because they were ambiguous and misled the jury as to the meaning of proof beyond a reasonable doubt, we would not be making a sweeping or groundbreaking pronouncement. We would simply be holding that Leavitt's trial was infirm because the instructions were so ambiguous and confusing that it is reasonably likely the jury understood them overall to allow conviction on proof less than beyond a reasonable doubt, which would, of course, violate due process under Winship.
 
 
 35
 Given that Cage error of the type claimed here would be a new rule not available at the time Leavitt's conviction became final, but not a watershed rule of the sort from which he can retroactively benefit on federal habeas review, his claim is Teague-barred. Therefore, it is unnecessary to determine whether the jury instruction actually ran afoul of Cage.
 
 
 36
 For these reasons, the district court could not grant the petition and its order must be reversed.
 
 II. PRETRIAL PUBLICITY
 
 37
 Leavitt complains that pretrial publicity in Blackfoot required a change of venue. The Idaho trial court and the Idaho Supreme Court held to the contrary. The latter reviewed the record and concluded: "[T]he pretrial publicity had little if any effect on the potential jurors, and [we] find no indication that potential jurors would prejudge the case." Leavitt I, 116 Idaho at 288, 775 P.2d at 602.
 
 
 38
 We, too, "must independently examine the news reports for volume, content, and timing to determine if they were prejudicial." Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir.1993). Still, the jury bias issue presents a factual question, and the Idaho courts' finding that the jury was not biased is entitled to the usual presumption of correctness. Id.
 
 
 39
 Having reviewed the record, we agree that Leavitt was not deprived of his right to "a panel of impartial, indifferent jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (internal quotation marks omitted). First, there was not such a barrage of inflammatory publicity as would lead to a presumption of prejudice. See Ainsworth v. Calderon, 138 F.3d 787, 795, amended, 152 F.3d 1223 (9th Cir.1998); Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir.1997). Although Blackfoot is a small community and the crime was vile, that alone did not require a change of venue. See Fetterly v. Paskett, 163 F.3d 1144, 1146 (9th Cir.1998); see also United States v. Rewald, 889 F.2d 836, 864 (9th Cir.1989), amended, 902 F.2d 18 (9th Cir.1990); Seattle Times Co. v. United States Dist. Court, 845 F.2d 1513, 1517-18 (9th Cir.1988). The published articles were essentially factual in nature, and the testimony showed that the community was not inflamed against Leavitt. See Harris v. Pulley, 885 F.2d 1354, 1362-63 (9th Cir.1988).
 
 
 40
 Second, no actual prejudice was shown here. On the contrary, each individual who was seated on Leavitt's jury swore that he or she could impartially judge Leavitt's guilt or innocence. Cf. Blodgett, 5 F.3d at 1189. Only a handful of prospective jurors indicated an inability to sit because they had formed an opinion about Leavitt's guilt,[10] and a few others knew his family and, actually, felt favorably disposed towards him.[11] That does not suggest that Leavitt's constitutional rights were invaded, and certainly does not suggest that the Idaho courts' assessment of the situation was unwarranted or incorrect.[12]
 
 III. EVIDENTIARY ISSUES
 
 41
 Leavitt complains about the admission of some items of evidence against him and about the failure of the prosecution to disclose or preserve other items.
 
 A. Evidence Related to Cooperation
 
 42
 Leavitt grumbles about the fact that the prosecutor elicited evidence about and commented upon, Leavitt's failure to cooperate with the investigation and to tell his ultimate story before he testified at trial. Most of his complaints arise out of his confusing true silence with lies, and cooperation with feints at cooperation coupled with suggestions to the jury that he had, in fact, cooperated.
 
 
 43
 A defendant who has received Miranda[13] warnings can, thereafter, remain silent without running the risk that the prosecutor will comment upon that fact. See Doyle v. Ohio, 426 U.S. 610, 617-18, 96 S.Ct. 2240, 2244-45, 49 L.Ed.2d 91 (1976). That part of the canon stated, however, it must be added that talking is not silence. Thus, when a defendant chooses to speak, the prosecutor can, surely, explore that speech and its implications. See Anderson v. Charles, 447 U.S. 404, 408, 100 S.Ct. 2180, 2182, 65 L.Ed.2d 222 (1980) (per curiam). In that event, as the Supreme Court bluntly put it, "the defendant has not remained silent at all." Id.
 
 
 44
 Thus, the prosecutor may point out inconsistencies. See United States v. Ochoa Sanchez, 676 F.2d 1283, 1286 (9th Cir.1982). The omission of critical details may also be explored. See id.; see also United States v. Makhlouta, 790 F.2d 1400, 1404 (9th Cir.1986). Similarly, when the defendant seeks to convey the impression that he cooperated with the police, the prosecutor can explore facts which suggest that the defendant did not do so. See McMillan v. Gomez, 19 F.3d 465, 469-70 (9th Cir.1994).
 
 
 45
 In this instance, statements that Leavitt made to the police psychologist were admissible to demonstrate inconsistencies with the story he told at trial and to cast doubt upon his claim of cooperation with the police. Leavitt conceded at trial that his decision to speak with the psychologist was voluntary, and there is no evidentiary support of Leavitt's claim that the police promised him use immunity in exchange for agreeing to talk with the psychologist. There was no error in admitting that evidence.
 
 
 46
 The same may not be quite as true of his silence at the special inquiry, which is arguably a judicial,[14] rather than a police, proceeding. The distinction between the two is enough to suggest that his silence at the special inquiry may not have been relevant to his claim of cooperation with the police, and that it was arguably improper to comment upon the exercise of his right to remain silent as to certain questions. However, in the context of all of the evidence in this case, including the myriad of other inconsistencies in his stories, any error was harmless as far as this habeas corpus proceeding is concerned. See Brecht v. Abrahamson, 507 U.S. 619, 638, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).
 
 
 47
 Of the same ilk are Leavitt's ululations about the prosecutor's comment on the fact that a wholly new blood story surfaced at trial. When speaking to the police, Leavitt indicated that he had no idea how his blood could have been found at the murder scene, but by trial he had developed a wholly inconsistent explanation of its presence — the nosebleed scenario. His jeremiad about the prosecutor's exploration of his revenant memory avails him nothing. That surely was proper impeachment. See Anderson, 447 U.S. at 408-09, 100 S.Ct. at 2182; United States v. Harris, 726 F.2d 558, 559-60 (9th Cir.1984). It underscored his lies as well as his actual lack of cooperation. Then there was the cut on Leavitt's finger where, again, his trial explanation differed radically from his pretrial explanation. Again, his hope that he could misdirect the police investigation and claim cooperation at the same time must die aborning. See id.; Phelps v. Duckworth, 772 F.2d 1410, 1412-13 (7th Cir.1985).
 
 
 48
 In a slightly different vein, Leavitt complains of the prosecutor's showing that of all of the suspects, only Leavitt had refused to give a blood sample voluntarily. Leavitt asserts that it was improper to comment on the exercise of his right under the Fourth Amendment to the United States Constitution to refuse to consent to a search. We have indicated that, taken by themselves, comments on the exercise of one's Fourth Amendment rights are improper.[15] See United States v. Prescott, 581 F.2d 1343, 1350-52 (9th Cir.1978); United States v. Taxe, 540 F.2d 961, 969 (9th Cir.1976); Newhouse v. Misterly, 415 F.2d 514, 518 (9th Cir.1969). But, again, Leavitt's argument is misdirected. Regardless of whether that Fourth Amendment rule should generally apply to habeas corpus cases, Leavitt's particular objection is answered by the much more banal and obvious rule that admission of the evidence was proper to attack his claim of cooperation. See United States v. McNatt, 931 F.2d 251, 257-58 (4th Cir.1991). Before there was ever any mention of the blood test, Leavitt had already launched himself on his theme of cooperation. The prosecutor was entitled to question that theme by showing that the leitmotiv was actually one of resistance. Again, we find no error.[16]
 
 B. Other Acts
 
 49
 Leavitt next argues that the admission of other-act evidence denied him a fair trial. Under Idaho law the evidence was admissible. See Leavitt I, 116 Idaho at 290-91, 775 P.2d at 604-05. We cannot question that. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 479-80, 116 L.Ed.2d 385 (1991). However, we can ask whether its admission rendered the trial so fundamentally unfair as to deny Leavitt due process. Id. at 68, 112 S.Ct. at 480. In that regard, we have opined that other-act evidence is irrelevant and may violate the due process clause if it goes only to character and "there are no permissible inferences the jury may draw" from it. McKinney v. Rees, 993 F.2d 1378, 1380, 1384 (9th Cir.1993) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir.1991)); see also Windham, 163 F.3d at 1103; Jammal v. Van de Kamp, 926 F.2d 918, 919-20 & n. 2 (9th Cir.1991).
 
 
 50
 Leavitt demurs to the fact that his ex-wife testified that once, while hunting, she came upon him as he carefully and rather surreptitiously was cutting at the female sexual organs of a deer. He then removed those organs, examined them, and played with them because, he said, he wanted to see how they worked. It will be recalled that the victim in this case (or her body if she was then deceased) was subjected to a highly unusual removal of her female organs. Other evidence showed that it would be difficult to accomplish that in the way it was done and that it would help to have knowledge of anatomy when doing it.
 
 
 51
 We agree with the Idaho Supreme Court that the evidence in question was relevant to identifying the killer. We cannot find that the Idaho Supreme Court committed constitutional error when it opined that:
 
 
 52
 In the instant case the corpse of the victim had been brutalized by the removal of her sexual organs by a person who clearly had certain anatomical knowledge. That evidence tended to indicate that the defendant had a morbid and sadistic interest in sexual organs, had a knowledge of anatomy, a possible motive for the crime, and a modus operandi which tended to identify the defendant as the killer.
 
 
 53
 Leavitt I, 116 Idaho at 290, 775 P.2d at 604. We need not pass on whether an evidence scholar would entirely agree; we only decide that the United States Constitution was not violated.
 
 
 54
 The same can be said about the episode testified to by Leavitt's girlfriend to the effect that he showed her a knife, which was never produced, at a rather peculiar point during a sexual encounter with her. Leavitt's failure to produce that particular knife for the police officers went to the question of his alleged cooperation with them. Because that, of all knives, was missing, some inference was also possible that it was the murder weapon itself or the knife that was used to cut Elg's screen. See McKinney, 993 F.2d at 1383-84. Still and all, the connection was pretty thin. Thinner still is the relevance of other knives, which were admitted into evidence. True, they could have been weapons used by the unknown intruder or the murderer, but nothing tended to show that they were; the missing knife was probably a better candidate for that.
 
 
 55
 Nevertheless, considering the other evidence in this case, we are unable to say that, error or not, the knife evidence by itself or in tandem with other errors "`had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht, 507 U.S. at 637, 113 S.Ct. at 1722 (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).
 
 C. Victim's Statements
 
 56
 The doomed victim of this crime had, as we have already noted, been severely frightened on the night before her death by a prowler, who tried to break into her home. In a great state of agitation,[17] she called the police and spoke to dispatchers and to police officers. Among other things, she said that she thought the prowler was Leavitt, because he had tried to talk himself into her home earlier that day,[18] but she had refused him entry. Leavitt claims that the admission of the hearsay testimony violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. Of course, one cannot confront a hearsay declarant, but not all uses of hearsay violate the Confrontation Clause. See Idaho v. Wright, 497 U.S. 805, 813-14, 110 S.Ct. 3139, 3145-46, 111 L.Ed.2d 638 (1990). Hearsay can be admitted if it is sufficiently reliable. Reliability is shown when the hearsay "falls within a firmly rooted hearsay exception or is supported by particularized guarantees of trustworthiness." Guam v. Ignacio, 10 F.3d 608, 612 (9th Cir.1993) (citation and internal quotation marks omitted).
 
 
 57
 The Idaho courts relied upon the state's residual exception,[19] which is not firmly rooted, but the evidence could properly have come in under the excited utterance exception,[20] which is. See Wright, 497 U.S. at 817, 820, 110 S.Ct. at 3147, 3149. We have considered the circumstances[21] and have no doubt that the victim was speaking while under the baleful influence of an exceedingly stressful event — the attempt by an intruder to break into her home. Nor do we doubt that she lacked the time or the incentive to reflect upon and confabulate a story. Thus, the evidence properly came in as an excited utterance.[22] There was no violation of Leavitt's constitutional rights.
 
 D. Undisclosed and Lost Evidence
 
 58
 That mysterious phantom, Mike Jenkins, looms large in an objection by Leavitt regarding an alleged Brady[23] violation by the prosecutor. Jenkins, who evidenced detailed knowledge of the murder, called and spoke to two different police dispatchers — Lisa Pugmire and Theta Duchscher. He first spoke with Pugmire, who never gave out her first name, and later spoke with Duchscher to whom he mentioned Pugmire's first name. Leavitt and Pugmire had a friendly relationship and had often spoken to each other before. Both dispatchers testified.
 
 
 59
 Pugmire testified that she could not say that Jenkins had Leavitt's voice. Duchscher was not asked, and did not say, whether she recognized his voice. At a later time, however, it was revealed that a police investigation had asked Duchscher whether she could make a connection between the voices, and she had said no. Later on, she had said that the voice could have been Leavitt's. Those facts were not disclosed to Leavitt and that, he says, constitutes the violation.
 
 
 60
 Even if there were some error, it was entirely harmless; it simply is not reasonably probable that the result of the proceeding would have been any different if Leavitt had obtained the information in question. The Leavitt-Jenkins connection was not based on voice recognition, but rather on Mike Jenkins's use of Pugmire's first name and on Mike Jenkins's response, when queried, that his address was near Leavitt's address. See Williams v. Woodford, 306 F.3d 665, 697 (9th Cir.2002); Hayes v. Woodford, 301 F.3d 1054, 1075 (9th Cir.2002).
 
 
 61
 The other evidence of which Leavitt deems himself improperly deprived was blood samples from the murder scene, which he could have subjected to further testing. But no more useable samples existed after the state serologists had performed their tests. Because it is undisputed that no bad faith was involved in the destruction of the possibly helpful blood samples, Leavitt simply cannot prevail on this claim. See Arizona v. Youngblood, 488 U.S. 51, 56, 109 S.Ct. 333, 336, 102 L.Ed.2d 281 (1988); California v. Trombetta, 467 U.S. 479, 488, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413 (1984); Cooper v. Calderon, 255 F.3d 1104, 1113-14 (9th Cir.2001); United States v. Hernandez, 109 F.3d 1450, 1455 (9th Cir.1997); Mitchell v. Goldsmith, 878 F.2d 319, 321-22 (9th Cir.1989). That is true, even though the results of the state's serologists' tests on the collected blood samples were used in the prosecution's case in chief. That simply cannot change our conclusion. See Trombetta, 467 U.S. at 491, 104 S.Ct. at 2535; Mitchell, 878 F.2d at 322.
 
 IV. ALIBI INSTRUCTION
 
 62
 Leavitt maintains that the alibi instruction, instruction 39,[24] impermissibly shifted the burden of proof on his alibi, his only defense. We understand his argument to be that the issue was not procedurally defaulted based on the doctrine of invited error, as the district court held, because — as the court also held — the Idaho Supreme Court said that it had reviewed all trial issues on the merits, including instruction 39, and thus so would the habeas court. We agree with Leavitt that the issue is not procedurally defaulted, which means that the merits are before us.[25] On the merits, we have already held that the instruction is erroneous, Thomas v. United States, 213 F.2d 30, 33 (9th Cir.1954), but the error was harmless in Leavitt's case.
 
 
 63
 Leavitt unquestionably invited the alibi instruction by proposing it to the trial court. The Idaho Supreme Court could have refused to consider his challenge to the alibi instruction on this basis, State v. Carlson, 134 Idaho 389, 3 P.3d 67, 80 (Ct.App.2000), but did not. Had the Idaho Supreme Court rested its decision on the invited error doctrine, then it might have been an independent state ground that would bar consideration of the issue on habeas review in federal court. Cf. Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir.2003). Instead, the district court found that the Idaho Supreme Court had considered and rejected every possible allegation of trial error on the merits and failed to invoke an independent and adequate state procedural ground. The state acquiesced in this finding for purposes of this appeal. Consequently, the invited error doctrine cannot be invoked as an independent procedural reason for defeating Leavitt's challenge to the alibi instruction. See Panther v. Hames, 991 F.2d 576, 580 (9th Cir.1993).
 
 
 64
 We are not persuaded by Idaho's contention that federal habeas courts may independently rely on the invited error rule regardless of whether it was actually applied in state court. The state points to a number of cases in which a habeas claim was rejected on invited error grounds without the decision being expressly conditioned on prior invocation of the rule by the highest state court to consider the claim,[26] but in these cases the state court had clearly and expressly invoked the invited error doctrine.[27] There is no reason that we should treat the invited error rule differently from other state procedural bars.
 
 
 65
 Turning to the merits, Thomas held that there is no burden of proof on the accused regarding an alibi. But habeas relief is not available for every flawed instruction; the question is "`whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Estelle, 502 U.S. at 72, 112 S.Ct. 475 (quoting Cupp, 414 U.S. at 147, 94 S.Ct. 396); cf. Johnson v. Muncy, 830 F.2d 508 (4th Cir.1987) (flawed alibi instructions reviewed for harmless error). Leavitt argues (and the district court agreed) that instruction 39 misallocated the burden of proof, but what it really did was incorrectly identify an alibi as an affirmative defense and then impose on Leavitt the burden of producing enough evidence to create a reasonable doubt as to his guilt, i.e., as to his being at Elg's house instead of somewhere else. If he had not done at least that much, he would have had no alibi defense to begin with. That's exactly what happened in this case. Leavitt testified that he was home watching TV, but his testimony was uncorroborated. He had to be treated for a bad cut on his finger on the night of Elg's murder. He was severely impeached on both accounts. And his blood was mixed with Elg's in her room. It is inconceivable that any reasonable juror would have bought his alibi in these circumstances. Besides, the evidence overall was overwhelming. Therefore, the error in instruction 39 was harmless. Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); see also Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).
 
 V. PROSECUTOR'S ARGUMENT
 
 66
 Leavitt asserts that the prosecutor committed misconduct in arguing the case to the jury. Leavitt first complains about arguments that would be erroneous only if we had decided the evidentiary issues discussed in Part III in Leavitt's favor. Because we did not, we find no impropriety in those respects.[28] Nor was it improper for the prosecutor to argue that Leavitt — by legal strategy or otherwise — had delayed revealing or suggesting the "true new" story until after he had heard all of the evidence against him at trial. To any cognoscente of the trial process, one of the transaction costs of our system is that the order of proof can allow a defendant to tailor his testimony, but "[t]he adversary system surely envisions — indeed, it requires — that the prosecutor be allowed to bring [the tailoring danger] to the jury's attention." Portuondo v. Agard, 529 U.S. 61, 69-70, 120 S.Ct. 1119, 1125-26, 146 L.Ed.2d 47 (2000). That, essentially, is what occurred in this case; it was not misconduct.
 
 
 67
 Much more problematic is the prosecutor's link-in-the-chain-of-law-enforcement argument. Here it is in all of its glory:
 
 
 68
 In closing let me just say that you are part of a very important chain called the chain of law enforcement. And law enforcement and justice don't work in our country unless you do your part. The police officers can be as well trained as you want them and the forensic sciences can be as well trained as you want in the sciences. And they can go out an[d] investigate crimes as competently and professionally as this group has done. And I think that Officer Robinson and those associated with him have done an excellent job. You can have the best prosecutors around. And I want to tell you that I believe Mr. Moss is one of the best prosecutors in the State. And they work together like this because they are part of the chain of law enforcement that keeps our community safe.
 
 
 69
 But the third link in that chain is a jury, which when they're given the proper evidence and they are given the proof beyond a reasonable doubt, they have the fortitude to be able to act upon that and to preserve that chain unbroken.
 
 
 70
 And the fourth link in the chain, of course, is the judge who has the courage and also the wisdom to impose the appropriate sentence. Now, none of this works unless you do your job.
 
 
 71
 This suggestion that the jury is simply a link in a chain of law enforcement which includes the police, the prosecutor, and the judge is just plain wrong. It minimizes the important role of the jury and tends to align neutrals — judge and jury — with a party to the case — the state itself. The Tenth Circuit put the matter very well when it was presented with a link-in-the-chain argument. It said:
 
 
 72
 By suggesting that the jury is only the last link in a long decision, the statement tends to trivialize the jury's importance. This argument also misstates the role of the jury, placing it in an adversarial position with the respect to the defendant. To the extent that the prosecutor's argument portrayed the jury as part of a team opposing the defendant, it was improper.
 
 
 73
 Coleman v. Brown, 802 F.2d 1227, 1238 (10th Cir.1986) (internal citation omitted); see also Tucker v. Kemp, 802 F.2d 1293, 1296 (11th Cir.1986).
 
 
 74
 Although the argument is wholly undesirable, we cannot say that it alone — and it does essentially stand alone[29] — is enough to result in a determination that the trial was so infected with unfairness as to be a denial of due process. See Sassounian v. Roe, 230 F.3d 1097, 1105-06 (9th Cir.2000) (citations omitted). Similarly, we are unable to say that the error had a "substantial and injurious" effect on the verdict. Brecht, 507 U.S. at 638, 113 S.Ct. at 1722. In that regard, we note that the jury was instructed that argument of counsel is not evidence. That instruction tends to draw the sting from improper arguments. See Drayden v. White, 232 F.3d 704, 713 (9th Cir.2000); Sassounian, 230 F.3d at 1106-07; James v. Borg, 24 F.3d 20, 28 n. 4 (9th Cir.1994). We do not, however, put all of our weight upon it. Rather, the whole record of this case — the strength of the evidence and the paucity of error — assures us that this deviation from propriety was not enough to make any difference in the result.
 
 VI. SENTENCING ISSUES
 
 75
 Leavitt also attacks his sentencing on various grounds. One of them is, in fact, dispositive. However, in the hope that addressing the other questions now put to us will help guide the writing of future chapters of this almost twenty-year-old tale, we will also address the others.
 
 A. Ring v. Arizona
 
 76
 As is well known by now, in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the Supreme Court determined that a capital sentencing scheme wherein the judge decides aggravating facts without a jury is unconstitutional. Id. at 609, 122 S.Ct. at 2443. We have held that Ring is retroactive to cases on habeas corpus review and that it invalidates certain death sentences previously imposed by a judge. See Summerlin v. Stewart, 341 F.3d 1082, 1121 (9th Cir.2003) (en banc), cert. granted, Schriro v. Summerlin, 540 U.S. 1045, 124 S.Ct. 833, 157 L.Ed.2d 692 (2003). Thus, we will vacate Leavitt's sentence and will remand to the district court for issuance of a conditional writ of habeas corpus that will give the state an opportunity to resentence Leavitt in a manner that accords with constitutional requirements.
 
 
 77
 B. Idaho's Heinous, Atrocious or Cruel Aggravator
 
 
 78
 Under Idaho law, a first degree murderer, like Leavitt, may be sentenced to death, if the court finds at least one aggravating circumstance beyond a reasonable doubt. See Idaho Code §§ 18-4004, 19-2515(c). One of those aggravators is: "The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity." Id. § 19-2515(h)(5)(formerly § 19-2515(g)(5)). That is the one which was found to apply to Leavitt. See Leavitt II, 121 Idaho at 5, 822 P.2d at 524. He asserts it is too vague to sustain a sentence of death. If it stood in its stark naked form, it probably would be. See Arave v. Creech, 507 U.S. 463, 473, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993) (per curiam); Shell v. Mississippi, 498 U.S. 1, 1, 111 S.Ct. 313, 313, 112 L.Ed.2d 1 (1990); Walton v. Arizona, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990); Maynard v. Cartwright, 486 U.S. 356, 363-64, 108 S.Ct. 1853, 1859, 100 L.Ed.2d 372 (1988). But it has since been clothed with meaning and, as so attired, is not too vague.[30] We will explain.
 
 
 79
 As the Supreme Court has directed, we "must attempt to determine whether the state courts have further defined the vague terms, and if they have done so, whether those definitions are constitutionally sufficient, i.e., whether they provide some guidance to the sentencer." Walton, 497 U.S. at 654, 110 S.Ct. at 3057. We have done just that and we are satisfied that the Idaho Supreme Court has provided sufficient guidance. The weave is a bit complex and takes some explanation, but it is still a proper one.[31]
 
 
 80
 The Idaho Supreme Court has construed the aggravator by relying in part on the limiting constructions given to similar language by other states. As to the phrase "especially heinous, atrocious, or cruel," it looked to the Florida Supreme Court's definition, which it quoted as follows:
 
 
 81
 [W]e feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
 
 
 82
 State v. Osborn, 102 Idaho 405, 418, 631 P.2d 187, 200 (1981) (quoting State v. Dixon, 283 So.2d 1, 9 (Fla.1973)). And the phrase "exceptional depravity" was given additional meaning by consideration of the Nebraska Supreme Court's explanation, which was quoted as follows:
 
 
 83
 In interpreting this portion of the statute, the key word is "exceptional." It might be argued that every murder involves depravity. The use of the word "exceptional," however, confines it only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence.
 
 
 84
 Id. (quoting State v. Simants, 197 Neb. 549, 566, 250 N.W.2d 881, 891 (1977)). Idaho then added its own explanation:
 
 
 85
 With these constructions, i.e., that the murder must be accompanied by acts setting it apart from the norm of murders and that its commission manifests such depravity as to offend all standards of morality and intelligence, the aggravating circumstance contained in I.C. § 19-2515(h)(5) is sufficiently definite and limited to guide the sentencing court's discretion in imposing the death penalty.
 
 
 86
 Id. Those were the rules utilized in the review of Leavitt's case. See Leavitt II, 121 Idaho at 5-7, 822 P.2d at 524-26; Leavitt I, 116 Idaho at 292-93, 775 P.2d at 606-07.
 
 
 87
 Is that enough "to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not"? Lewis v. Jeffers, 497 U.S. 764, 776, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606 (1990). The Supreme Court has already as much as said that it is. In fact, in Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the Court, quoting Dixon, set out Florida's summation that the heinous, atrocious or cruel factor referred to "`the conscienceless or pitiless crime which is unnecessarily torturous to the victim,'"[32] the precise language adopted by Idaho. The Court then held: "We cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." Id. at 255-56, 96 S.Ct. at 2968. That, perforce, must mean that Idaho's definition does sufficiently delimit the statutory language sufficiently to pass constitutional muster.
 
 
 88
 Leavitt objects that the Idaho language is larded up with other words that may not, themselves, be sufficient to delimit the overall definition. But that can make no real difference to our analysis. We do not sit to issue pronunciamentos about the elegance, beauty, sophistication, or timelessness of Idaho's prose. Nor can we ask ourselves whether language sufficient to limit a factor to the point that it meets constitutional requirements, but which then purports to limit it even further, really does limit it further.
 
 
 89
 Thus, the fact that the Supreme Court has looked askance at some of the Idaho language,[33] when it was the sole adornment of a statute, is beside the point. In fact, the same inappropriate language appeared in the instruction approved in Proffitt.[34] Similarly, we need not ask ourselves whether the definition of "exceptional depravity" used in Nebraska sufficiently limits that concept.[35] Again, whether it does or not is of no consequence. The language that makes it part of the heinous, atrocious or cruel aggravator is not disjunctive — it is conjunctive in nature. See Idaho Code § 19-2515(h)(5). Once it is decided that the murder was heinous, atrocious or cruel under the properly limited definition of that phrase, the fact that for Idaho purposes it must also "manifest exceptional depravity" can do nothing but help a murderer like Leavitt, even if we thought that the latter phrase would be a bit too spongy standing alone.[36]
 
 
 90
 In fine, taken as a whole, Idaho's delineation of the meaning of heinous, atrocious or cruel aggravation is sufficient to guide the discretion of the sentencer.
 
 C. Evidence to Support Aggravation
 
 91
 Leavitt next argues that the evidence will not support a determination that he earned the heinous, atrocious or cruel aggravator. We beg to differ.
 
 
 92
 While Leavitt may well be able to envision slayings that are even more heinous, atrocious or cruel, the evidence here was sufficient to allow the Idaho courts to determine that this especially vile murder was a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." Osborn, 102 Idaho at 418, 631 P.2d at 200 (citation and internal quotation marks omitted). Certainly, we cannot agree with Leavitt's suggestion that there was nothing very special about this killing as opposed to the mine run of murders, and cannot say that "no reasonable sentencer could find [the aggravating] circumstance to exist." Creech, 507 U.S. at 478, 113 S.Ct. at 1544 (internal quotation marks and citation omitted).
 
 
 93
 Leavitt's repeated and pitiless stabbing and cutting of his victim in all parts of her body, including even a thrust through her eye and into her brain, was vicious and remarkable enough for the most jaded reviewer of this genre of crimes. The added organ-removing mutilation of the victim "[a]s part of the death dealing attack or as a grisly aftermath" is yet another marker of the unnecessary torturousness of this crime. Leavitt II, 121 Idaho at 7, 822 P.2d at 526.
 
 
 94
 But, says Leavitt, if the mutilation took place just after the victim expired, it does not count. He cites a Florida case for that supposed proposition. See Halliwell v. State, 323 So.2d 557, 561 (Fla.1975). The case held no such thing. What it did hold was that a dismembering of a body many hours after the completed murder could not be seen as part of the murder itself, although "[i]f mutilation had occurred prior to death or instantly thereafter it would have been more relevant in fixing the death penalty." Id. As the Florida court hinted it would do, the Idaho courts have treated immediately postmortem conduct as part of the crime itself. See State v. Wood, 132 Idaho 88, 104, 967 P.2d 702, 718 (1998). In Wood, the court was not considering the heinous, atrocious or cruel aggravator, but, in principle, that is of no real consequence. At any rate, it was considering that aggravator in this case, so we know what the Idaho courts think of the matter.
 
 
 95
 We fail to see how use of that conduct could constitute federal constitutional error.[37] Of course, neither the Idaho courts, nor we, know whether the victim still had life in her when Leavitt undertook his bizarre organ-removal activity, nor do we know if she was conscious, nor do we know what her nerves and brain might have registered if she was unconscious but still living. Still and all, neither the Idaho courts, nor we, should have to engage in such refined, theoretical timeline calculations when determining whether Leavitt could qualify for the aggravator. The simple fact is that the whole of Leavitt's behavior during the murderous assault depicted an attack that was conscienceless, pitiless and unnecessarily torturous to the victim. The mutilation was part of that.
 
 
 96
 In sum, a rational trier of fact could have found that the heinous, atrocious or cruel aggravator was satisfied beyond a reasonable doubt.
 
 VII. IDAHO APPELLATE ERROR
 
 97
 In deciding whether Leavitt was eligible for the death penalty, the Idaho Supreme Court first had to note that he had been convicted of first degree murder. See Idaho Code § 18-4004. It had no doubt he had been, but it referred particularly to torture[38] rather than to premeditated murder as such — both of which are distinct forms of premeditated murder in Idaho — although the case went to the jury on a premeditated murder theory. That, says Leavitt, violated his due process rights because his conviction was upheld on the basis of an offense not presented to the jury. See Presnell v. Georgia, 439 U.S. 14, 14-17, 99 S.Ct. 235, 235-37, 58 L.Ed.2d 207 (1978) (per curiam).
 
 
 98
 We are inclined to think that Leavitt now overstates what the Idaho Supreme Court was doing when it made reference to torture murder — it surely did not say that there was not sufficient evidence of premeditated murder. More importantly, however, we agree with the district court that Leavitt procedurally defaulted on this claim because he never argued it to the Idaho courts.
 
 
 99
 Thus, Leavitt can only avoid procedural default if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991).
 
 
 100
 In order to establish prejudice, Leavitt "must establish not merely that the [alleged Presnell error] constituted a possibility of prejudice, but that [it] worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Correll v. Stewart, 137 F.3d 1404, 1415 (9th Cir.1998) (citation and internal quotation marks omitted). He cannot do so because he suffered no actual disadvantage from the Idaho Supreme Court's characterization of his crime as torture murder rather than premeditated murder. The Idaho Supreme Court conducted this inquiry only to determine whether Leavitt was eligible for the death penalty. Leavitt I, 775 P.2d at 606. Regardless of the characterization, he was eligible for the death penalty because both torture murder and premeditated murder are forms of first degree murder, I.C. § 18.4003(a), and under Idaho law, every form of first degree murder is potentially punishable by death. See I.C. § 18-4004.
 
 
 101
 Nor can Leavitt show that he would be subjected to a fundamental miscarriage of justice if his procedural default is not waived. The evidence that he committed this murder is powerful to say the least, and, while he has now found an ambiguity in the Idaho Supreme Court opinion, that is a far cry from saying, or even suggesting, that he is actually innocent of first degree murder under Idaho law. See Bousley v. United States, 523 U.S. 614, 623-24, 118 S.Ct. 1604, 1611-12, 140 L.Ed.2d 828 (1998); Schlup v. Delo, 513 U.S. 298, 314-15, 115 S.Ct. 851, 860-61, 130 L.Ed.2d 808 (1995); Sawyer v. Whitley, 505 U.S. 333, 349-50, 112 S.Ct. 2514, 2524-25, 120 L.Ed.2d 269 (1992).
 
 
 102
 Therefore, the district court properly refused to consider the Presnell issue.
 
 VIII. INEFFECTIVE ASSISTANCE OF COUNSEL
 
 103
 Leavitt was tried and sentenced in the Idaho trial court, had a first appeal to the Idaho Supreme Court at which his conviction was affirmed but his sentence vacated, was again sentenced, and had a second appeal to the Idaho Supreme Court at which time his sentence was affirmed. He now complains of ineffective assistance of counsel in the first three of those proceedings,[39] but he never argued most of the claims in the Idaho courts. The district court, therefore, found procedural default and refused to consider them.
 
 
 104
 Leavitt's only claim on appeal is that we have held that Idaho's procedural default rules unreasonably restrict the ability of Idaho prisoners to raise ineffective assistance of counsel claims. That, he says, allows him to raise all of the claims here. See Hoffman, 236 F.3d at 530. In tendering that sweeping proposition, he greatly overstates the holding and reach of Hoffman.
 
 
 105
 In an attempt to accelerate proceedings in death penalty cases, Idaho has declared that any challenge to a "sentence or conviction that is known or reasonably should be known" must be filed within forty-two days of the filing of the judgment in the trial court. Idaho Code § 19-2719(3). That includes post-conviction claims. Id. § 19-2719(4). A failure to raise the claims within that time waives them. Id. § 19-2719(5). In Hoffman, the defendant did not adhere to those time constraints. He attempted to file an ineffective assistance of trial counsel claim in a later post-conviction petition, but his petition was dismissed as untimely. Hoffman, 236 F.3d at 530. That was true, even though Hoffman was represented by the same counsel at trial and on appeal. Id. at 533-34. As we pointed out:
 
 
 106
 In Hoffman's case, the Idaho Supreme Court held that petitioner's ineffective assistance of counsel claims were procedurally barred because they were filed after the expiration of the state's forty-two day statutory deadline. The Idaho Supreme Court applied the rule despite the fact that Hoffman continued to be represented by his original trial counsel during the forty-two day period.
 
 
 107
 Id. We continued: "As a result, Hoffman was deprived of counsel who could review the record objectively for ineffective assistance of counsel claims. Not surprisingly, Hoffman's trial counsel failed to raise and argue the issue of their own ineffectiveness in post-conviction proceedings." Id. at 534. Therefore, we determined that Idaho law "effectively prevented Hoffman from timely raising his ineffective assistance of counsel claims." Id. at 535-36. As a result, federal review was not barred. Id. at 530.
 
 
 108
 That is all well and good, but it does not apply to Leavitt's appeal from (and request for post-conviction relief) his first trial and sentencing. He did not have the same trial and appellate counsel. Rather, he had new appellate counsel, and those attorneys actually raised ineffective assistance of trial counsel claims before the Idaho Supreme Court. See Leavitt I, 116 Idaho at 291, 775 P.2d at 605. Additionally, Leavitt's post-trial counsel had full access to the record and transcript when preparing Leavitt's post-conviction petition, and Leavitt's post-trial counsel was given the opportunity to conduct an investigation beyond the court records when the trial court held a one-day hearing at which Leavitt's trial counsel testified. In other words, the unfairness that we found in Hoffman does not appear in this case. We cannot declare that the appellate procedures following Leavitt's initial trial and sentence were inadequate.[40]
 
 
 109
 Similarly, Hoffman has nothing to say about Leavitt's claims that appellate counsel was himself ineffective in the handling of the first appeal. Wisely enough, the Idaho Supreme Court has recognized that a person cannot really raise the question of ineffective appellate counsel within forty-two days of the entry of judgment in the trial court. On the contrary, those kinds of claims need only "be asserted within a reasonable time after they are known or reasonably could have been known." Paz v. State, 123 Idaho 758, 760, 852 P.2d 1355, 1357 (1993); see also Porter v. State, 136 Idaho 257, 260, 32 P.3d 151, 154 (2001). We have not been directed to any case that construes "reasonable time" in an overly restrictive manner. Thus, it cannot be said that Idaho's rule is inadequate in this respect either.
 
 
 110
 Leavitt has a considerably better point regarding his claim that he had ineffective assistance of counsel at the time of his second sentencing hearing. The same attorney represented him there and on his resulting appeal. That attorney did not raise the possibility of his own ineffectiveness at that time, although he did question imposition of the death penalty. See Leavitt II, 121 Idaho at 4, 822 P.2d at 523. That ineffectiveness issue does fall directly within the area of our concern in Hoffman. Thus, although it was procedurally defaulted, it can still be raised on habeas corpus. Were it not for the fact that we are setting aside the second sentencing on another ground, this error would require that we return this issue to the district court for further proceedings.
 
 CONCLUSION
 
 111
 Leavitt is not entitled to habeas corpus relief as far as his conviction is concerned. However he is entitled to a new sentencing hearing.
 
 
 112
 Thus, we AFFIRM on all issues raised in Leavitt's cross-appeal, other than the Ring issue,[41] and REVERSE on the State's appeal. Because of our holding in Summerlin, we set aside the district court's decision on the various sentencing issues, and remand for issuance of a conditional writ of habeas corpus, which will give the state an opportunity to resentence Leavitt in a manner that comports with federal constitutional requirements.
 
 
 113
 AFFIRMED in part; REVERSED in part; and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 See State v. Leavitt, 121 Idaho 4, 822 P.2d 523 (1991) (Leavitt II); State v. Leavitt, 116 Idaho 285, 775 P.2d 599 (1989) (Leavitt I).
 
 
 [2]
 The Court has since clarified that the standard of review articulated inCage — whether, in construing an instruction, reasonable jurors could have understood the charge as a whole as lessening the burden of proof — should instead be "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (citation omitted)(emphasis added). This is the Boyde standard of review, Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), and Estelle embraced it as the single standard for federal habeas courts considering ambiguous jury instructions.
 
 
 [3]
 There are nine different instructions that state the burden of proof correctly: instructions 10 and 11 (notwithstanding Leavitt's challenge to some of the wording), 24, 25, 28, 32, 33, 35, and 44. In addition, three instructions made clear that the decision to convict must be based only on evidence adduced at trial: one unnumbered preliminary instruction and instructions 6 and 15
 10: "Before you can convict the Defendant of the crime charged against him ... you should require the prosecution to prove every material allegation ... beyond a reasonable doubt. ... And if, after a consideration of all the evidence in the case, you entertain a reasonable doubt of the truth of any one of these material allegations, then it is your duty to give the Defendant the benefit of such doubt and acquit him.... There must be proof beyond a reasonable doubt."
 11: "A defendant in a criminal action is presumed to be innocent until the contrary is proved. And in case of a reasonable doubt whether his guilt is satisfactorily shown, he's entitled to an acquittal. This presumption places upon the State the burden of proving him guilty beyond a reasonable doubt."
 24: "If you are not satisfied beyond a reasonable doubt that the Defendant is guilty of the offense charged, he may, however, be guilty of any lesser offense...."
 25: "In order to prove the commission of the crime of Murder in the First Degree each of the following elements must be proved beyond a reasonable doubt...."
 28: "You will first determine whether or not the Defendant is guilty beyond a reasonable doubt of First Degree Murder. If you determine the Defendant is not guilty of First Degree Murder, you will then determine whether or not he is guilty beyond a reasonable doubt of Second Degree Murder...."
 32: "In order to prove the commission of the crime of Murder in the Second Degree, each of the following elements must be proved beyond a reasonable doubt...."
 33: "If you are convinced beyond a reasonable doubt that the crime of murder has been committed by the Defendant but you have reasonable doubt whether such murder was of First or of Second Degree, you must give to the Defendant the benefit of the doubt and return a verdict fixing the murder as of the Second Degree."
 35: "Where the case of the State rests substantially or entirely on circumstantial evidence, you are not permitted to find the Defendant guilty of the crime charged against him unless... each fact which is essential to complete a set of circumstances necessary to establish the Defendant's guilt must be proved beyond a reasonable doubt.... Also if the evidence is susceptible of two reasonable interpretations, one of which points to the Defendant's guilt and the other to his innocence, it is your duty to adopt that interpretation which points to the Defendant's innocence and reject the other which points to his guilt."
 44: "You should consider the included offenses only in the event the State has failed to convince you beyond a reasonable doubt of the guilt of the accused with respect to the crime charged. The jury will bear in mind that the burden is always upon the Prosecution to prove beyond a reasonable doubt every essential element of any lesser offense which is necessarily included in any crime charged in the Information. The law never imposes upon a Defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."
 Preliminary instruction (unnumbered): "It is your duty to determine the facts and to determine them from the evidence produced in open court."
 6: "The law requires that your decision be made solely upon the competent evidence before you."
 15: "In determining whether the Defendant is guilty or not guilty, you must be governed solely by the evidence received in this trial...."
 
 
 [4]
 Since 1989, the Court of Appeals for the Second Circuit has both affirmed and reversed convictions following trials at which this type of instruction was givenCompare United States v. Ciak, 102 F.3d 38, 45-46 (2d Cir.1996) (no plain error in instructing that presumption of innocence and making the government meet its burden of proving guilt beyond a reasonable doubt are rules of law designed to protect the innocent and not the guilty), with United States v. Doyle, 130 F.3d 523, 533 (2d Cir.1997) (holding, on de novo review, that it is a misstatement of the law to instruct that the presumption of innocence and making the government meet its burden of proving guilt beyond a reasonable doubt are rules of law designed to protect the innocent and not the guilty). The same court has (post-ADEPA) held that its rule disapproving such an instruction is not applicable on habeas review. See DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir.2002).
 
 
 [5]
 Instruction 10 stated:
 Before you can convict ... you should require the Prosecution to prove every material allegation contained in the Information beyond a reasonable doubt. And if, after a consideration of all the evidence in the case, you entertain a reasonable doubt of the truth of anyone of these material allegations, then it is your duty to give the Defendant the benefit of such doubt and acquit him. Probabilities, or that the greater weight or the preponderance of the evidence supporting the allegations in the Information, will not support a conviction. There must be proof beyond a reasonable doubt.
 Instruction 11 stated:
 It's not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the mind of the juror in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.
 Instruction 13 stated:
 It is not necessary that all of the facts and circumstances surrounding the testimony and evidence that is given on behalf of the State shall be established beyond a reasonable doubt. All that is necessary is that all of the facts and circumstances and evidence together shall establish the Defendant's guilt beyond a reasonable doubt.
 Instruction 36 stated:
 A doubt produced by undue sensibility in the mind of the juror in view of the consequences of a guilty verdict is not a reasonable doubt. And the jury are not allowed to create sources or materials of doubt by trivial or fanciful suppositions or by remote conjectures as to possible state of facts different from those established by the evidence. Your oath imposes upon you no obligation to doubt when no doubt would exist if no oath had been administered, and in consideration of the case, the jury is not to go beyond the evidence to hunt up doubts. A doubt to justify an acquittal must be reasonable.
 Instruction 39 stated:
 You are further instructed that an alibi is an affirmative defense. And it is incumbent upon the Defendant where he relies upon the defense of an alibi to prove it, not beyond a reasonable doubt nor a preponderance of the evidence, but by such evidence and to such a degree of certainty as will, when the whole evidence is considered, create and leave in the minds of the jury a reasonable doubt of his guilt.
 
 
 [6]
 This is by no means clear, as common definitions of "should," "shall" and "must" include both an obligatory and an exhortatory connotationSee, e.g., Webster's Third New International Dictionary (unabridged 1986).
 
 
 [7]
 Sullivan v. Louisiana, 508 U.S. 275, 281-82, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
 
 
 [8]
 It is now clear that we are not free to do thisSee Horn, 536 U.S. at 267, 122 S.Ct. 2147 (reminding courts not to overlook Caspari, 510 U.S. at 389, 114 S.Ct. 948).
 
 
 [9]
 BeforeSullivan several appellate courts had declined to apply Cage retroactively. See Adams v. Aiken, 965 F.2d 1306, 1312 (4th Cir.1992) (Adams I), vacated with directions to reconsider in light of Sullivan, 511 U.S. 1001, 114 S.Ct. 1365, 128 L.Ed.2d 42 (1994) (Adams II); Skelton v. Whitley, 950 F.2d 1037, 1044-45 (5th Cir.1992). "Since then, however, the decisions have been monolithically in favor of retroactivity." West v. Vaughn, 204 F.3d 53, 61 (3d Cir.2000).
 
 
 [10]
 Seven out of a sixty-person venireSee Ainsworth, 138 F.3d at 796.
 
 
 [11]
 Five people in the venire
 
 
 [12]
 We are aware of Leavitt's later attack on one of the seated jurors. Suffice it to say that no certificate of appealability has been issued on that question, which, therefore, is not properly before usSee United States v. Martin, 226 F.3d 1042, 1045 (9th Cir.2000). At any rate, the district court did not clearly err when, after an evidentiary hearing, it determined that the juror was not shown to have been biased.
 
 
 [13]
 Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 
 
 [14]
 A special inquiry is an evidence-gathering proceeding initiated by the prosecutor before a state district court magistrate. Idaho Code §§ 19-1116 to 19-1123. Those who appear are informed of the privilege against self-incriminationId. § 19-1121.
 
 
 [15]
 Whether the Supreme Court has directed that conclusion is another matter. It has alluded to it and has hinted that it might so holdSee Schmerber v. California, 384 U.S. 757, 765 n. 9, 86 S.Ct. 1826, 1833 n. 9, 16 L.Ed.2d 908 (1966). But to say that the Court has directed that result for habeas corpus purposes is problematic.
 
 
 [16]
 Similarly, Leavitt's failure to produce a knife that was in his possession — one that he had displayed to a girlfriend as part of a sexual encounter — went to offset his claim of cooperation
 
 
 [17]
 When speaking with the dispatcher she was crying, while breathing quickly and heavily, and when speaking to the police officers both her voice and her hands were shaking
 
 
 [18]
 She told the officers that Leavitt asserted that the cops were after him. That was a lie; they were not
 
 
 [19]
 Idaho R. Evid. 804(b)(5)
 
 
 [20]
 Idaho R. Evid. 803(2)
 
 
 [21]
 See Lilly v. Virginia, 527 U.S. 116, 136, 119 S.Ct. 1887, 1900, 144 L.Ed.2d 117 (1999).
 
 
 [22]
 Since we heard oral argument in this case, the Supreme Court issuedCrawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and held that the Sixth Amendment demands nothing less than "unavailability [of the declarant] and a prior opportunity for cross-examination" before testimonial hearsay statements may be admitted against a defendant in a criminal trial. Id. at 1374. We will doubtless be called upon to consider the retroactivity of Crawford's holding at some point, but we need not do so in this case. Although the question is close, we do not believe that Elg's statements are of the kind with which Crawford was concerned, namely, testimonial statements. While the Crawford Court left "for another day any effort to spell out a comprehensive definition of `testimonial,'" it gave examples of the type of statements that are testimonial and with which the Sixth Amendment is concerned — namely, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and ... police interrogations." Id. We do not think that Elg's statements to the police she called to her home fall within the compass of these examples. Elg, not the police, initiated their interaction. She was in no way being interrogated by them but instead sought their help in ending a frightening intrusion into her home. Thus, we do not believe that the admission of her hearsay statements against Leavitt implicate "the principal evil at which the Confrontation Clause was directed[:] ... the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." Id. at 1363.
 
 
 [23]
 Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 
 
 [24]
 See note 5 supra.
 
 
 [25]
 The state makes noTeague argument on Leavitt's cross-appeal. However, it does submit that we lack jurisdiction because Leavitt failed to obtain a certificate of appealability (COA) on instruction 39. This is incorrect, as Leavitt's challenge to the alibi instruction was part of the eleventh claim in his habeas petition, as to all of which the district court granted a COA.
 
 
 [26]
 See, e.g., Fields v. Bagley, 275 F.3d 478, 486 (6th Cir.2001) ("When a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error."); Parker v. Champion, 148 F.3d 1219, 1222 (10th Cir.1998) ("Even if the trial court erred in giving the second degree felony murder instruction, Parker invited the error by requesting this instruction at trial. This invited error precludes ... the grant of any habeas relief, on the basis of the alleged improper instruction."); Wilson v. Lindler, 8 F.3d 173, 175 (4th Cir.1993) (en banc) (per curiam) ("Even if we were to find such error in the trial of this case in the state court, the error was invited and therefore cannot form the basis for habeas corpus relief."); Leverett v. Spears, 877 F.2d 921, 924 (11th Cir.1989) ("Petitioner both argued for and submitted the written jury instructions [he now challenges]. Therefore, the doctrine of invited error applies to preclude petitioner from complaining of this error on appeal."); Coleman v. O'Leary, 845 F.2d 696, 699 (7th Cir.1988) ("[F]irmly embedded in Supreme Court precedent is the doctrine that a federal habeas petitioner who fails to comply with a state procedural rule, such as... invited error, at trial, thus barring state appellate court consideration of the merits of a criminal defendant's challenge to a state court conviction, precludes federal habeas review of that claim absent a showing of cause for, and prejudice resulting from, the procedural default."); Miller v. Oberhauser, 293 F.2d 29, 31 (9th Cir.1961) (rejecting a habeas petitioner's challenge to a jury instruction on the ground that "Petitioner requested the instruction to which he now objects").
 
 
 [27]
 See, e.g., Leverett, 877 F.2d at 924 (citing Leverett v. State, 462 So.2d 972, 977 (Ala.Crim.App.1984), in which the Alabama Court of Criminal Appeals held that "[i]n recognizing [the invited error] doctrine as applicable to the case at bar, we hold that, because of Leverett's actions at trial, Leverett is estopped from complaining of any possible resulting error"); Coleman, 845 F.2d at 699 (taking note of "the Illinois Appellate Court's subsidiary holding that under Illinois law the conduct of Coleman and his attorney leading to the trial judge's refusal to continue his initial testing order `invited the error'"); Oberhauser, 293 F.2d at 31 (citing People v. Miller, 185 Cal.App.2d 59, 8 Cal.Rptr. 91, 105 (1960), in which the California Court of Appeal held that "[i]f the giving of this instruction was error, it was an error invited by the defendant of which he may not now complain"); Champion, 148 F.3d at 1221 (preceding Oklahoma state court decision not available); Wilson, 8 F.3d at 174 (preceding South Carolina state court decision not available).
 
 
 [28]
 We did note that there may have been error — the silence at the inquest and some of the knife evidence. But just as the evidence itself was harmless, so, too, was argument about it
 
 
 [29]
 We are aware of the vouching elements lurking in the argumentSee, e.g., United States v. Leon-Reyes, 177 F.3d 816, 821-22 (9th Cir.1999); United States v. Necoechea, 986 F.2d 1273, 1278 (9th Cir.1993); United States v. Smith, 962 F.2d 923, 933-34 (9th Cir.1992). However, vouching is not an issue presented to us on this appeal. Thus, we will not take it up. See Smith v. Marsh, 194 F.3d 1045, 1052 (9th Cir.1999); see also Duckett v. Godinez, 67 F.3d 734, 746 n. 6 (9th Cir.1995).
 
 
 [30]
 Leavitt asks us not only to peruse the raiment itself, but also to see if the state has consistently used it. We cannot do the latterSee Creech, 507 U.S. at 477, 113 S.Ct. at 1544.
 
 
 [31]
 We have had an opportunity to confront the issue in the past, but have been able to resolve the cases then before us on other groundsSee Pizzuto v. Arave, 280 F.3d 949, 970 (9th Cir.2002); Hoffman v. Arave, 236 F.3d 523, 541-42 (9th Cir.2001). Today, we shall confront it.
 
 
 [32]
 Id. at 255, 96 S.Ct. at 2968.
 
 
 [33]
 See Shell, 498 U.S. at 1, 111 S.Ct. at 313.
 
 
 [34]
 If the Supreme Court no longer likes the language it approved, it, not we, will have to overrule this portion ofProffitt. See Agostini v. Felton, 521 U.S. 203, 237-38, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997).
 
 
 [35]
 The Eighth Circuit once said it does notSee Moore v. Clarke, 904 F.2d 1226, 1230-32 (8th Cir.1990). That circuit now seems to have thought better of it, however. See Moore v. Kinney, 320 F.3d 767, 771 (8th Cir.2003) (en banc).
 
 
 [36]
 We do not opine on whether it would be wise to include all of the current language in a jury instruction. We need not resolve that issue here
 
 
 [37]
 Cf. Jeffers, 497 U.S. at 783-84, 110 S.Ct. at 3104(the court noted with approval the use of postmortem conduct in consideration of an aggravator).
 
 
 [38]
 Leavitt I, 116 Idaho at 292, 775 P.2d at 606.
 
 
 [39]
 He also claims ineffective assistance of counsel at state post-conviction proceedings. That he cannot successfully doSee Coleman, 501 U.S. at 752, 111 S.Ct. at 2566.
 
 
 [40]
 Although Idaho's procedural default rules were not unfairly applied to Leavitt, the district court did err in holding thatall of Leavitt's trial-based claims of ineffective assistance were procedurally defaulted. Two of the ineffective assistance claims that Leavitt raised in his habeas petition — challenging his trial counsel's failure (1) to call the serology expert and (2) to demonstrate prejudice by calling police officers — were actually considered and rejected on the merits in state court. Therefore, these two claims were not procedurally defaulted. However, both claims do lose on the merits, as a defendant's disagreement with his trial counsel's tactical decisions cannot form the basis for an ineffective assistance claim. See Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir.2001).
 
 
 [41]
 Of course, were we to reach it, we would reverse on the ineffective assistance of counsel claim regarding the second sentencing hearing
 
 
 FERNANDEZ, Circuit Judge, concurring:
 
 114
 I concur in the per curiam opinion, but as to parts I and IV, I do so for somewhat different reasons.[1]
 
 I. THE INNOCENCE INSTRUCTION
 
 115
 The Idaho trial court gave numerous instructions on the state's burden of persuasion,[2] and, while it was at it, gave an instruction on the presumption of innocence, which Leavitt neither objected to nor presented as a separate issue to the Idaho Supreme Court.[3] That instruction read as follows:
 
 
 116
 The rule of law which clothes every person accused of a crime with the presumption of innocence and imposes upon the State the burden of proving his guilt beyond a reasonable doubt is not intended to aid anyone who is in fact guilty to escape, but is a humane provision of the law intended, so far as human agencies can, to guard against the danger of an innocent person being unjustly punished.
 
 
 117
 The State essentially argues that even if the instruction injected a note of ambiguity into the trial performance, issuance of a writ of habeas corpus on that account is barred by Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). When a state argues "that the defendant seeks the benefit of a new rule of constitutional law, the court must apply Teague before considering the merits of the claim." Caspari v. Bohlen, 510 U.S. 383, 389, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994). Thus, I shall do that.
 
 
 118
 As is well known, the Teague rule provides that: "Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague, 489 U.S. at 310, 109 S.Ct. at 1075. And, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." Id. at 301, 109 S.Ct. at 1070.
 
 
 119
 There are generally four steps to the analysis. At the threshold, a court must decide if it is dealing with a criminal procedure rule. See Bousley v. United States, 523 U.S. 614, 619-21, 118 S.Ct. 1604, 1609-10, 140 L.Ed.2d 828 (1998). If it is, it must then move on to the classic Teague considerations:
 
 
 120
 To apply Teague, a federal court engages in a three-step process. First, it determines the date upon which the defendant's conviction became final. Second, it must [s]urve[y] the legal landscape as it then existed, and determine whether a state court considering[the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution.... Finally, if the court determines that the habeas petitioner seeks the benefit of a new rule, the court must consider whether the relief sought falls within one of the two narrow exceptions to nonretroactivity.
 
 
 121
 Lambrix v. Singletary, 520 U.S. 518, 527, 117 S.Ct. 1517, 1524-25, 137 L.Ed.2d 771 (1997) (internal citations and quotation marks omitted). In this case, there is an even earlier step which must be taken because Leavitt insists that the state has waived the Teague claim by not raising it in the district court.
 
 
 122
 I agree with Leavitt that, in general, an issue not raised at the district court is, and should be, deemed waived. See, e.g., Taniguchi v. Schultz, 303 F.3d 950, 958-59 (9th Cir.2002); see also Crawford v. Lungren, 96 F.3d 380, 389 n. 6 (9th Cir.1996). But that rule does not apply here. At the district court, the state did assert that Teague applied to Leavitt's claims, albeit in a very general way and without detail as to any particular claim. While I would ordinarily look askance at that cavalier approach to the difficult task of issue identification that district judges face, we have applied a softened rule to Teague issues when we discern that the dignity of the state and its judicial processes are involved.[4] Thus, we have announced that we can consider Teague issues, even when they have not been raised at all in the district court. See Boardman v. Estelle, 957 F.2d 1523, 1536-37 (9th Cir.1992). We have refused to do so when the state has explicitly declined to raise the issue in the district court and on appeal,[5] but that is not this case. Here the state did, at least, allude to the issue in the district court, and it has explicitly raised it before us. I will, therefore, move on to the consideration of the usual four steps.
 
 A. Procedural Rule
 
 123
 The threshold step is mounted successfully. It is rather apparent that Leavitt's attack on the innocence instruction is based upon the thought that it had an effect on the burden of persuasion. That does not go to the substance of the crime; it is a matter of procedure. See, e.g., In re Winship, 397 U.S. 358, 363-64, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970); Harmon v. Marshall, 69 F.3d 963, 966-67 (9th Cir.1995); Adams v. Aiken, 41 F.3d 175, 177-78 (4th Cir.1994); cf. Melton v. Moore, 964 F.2d 880, 882 (9th Cir.1992) (burden of persuasion change is procedural); Chow v. INS, 641 F.2d 1384, 1391 n. 4 (9th Cir.1981) (same). So, on to the big three.
 
 B. Finality
 
 124
 When was Leavitt's conviction final? The general rule of finality is easy enough to recite. "A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally decided." Caspari, 510 U.S. at 390, 114 S.Ct. at 953. Leavitt's conviction was affirmed on May 30, 1989,[6] and certiorari was denied on October 16, 1989.[7] But in that initial opinion, Leavitt's sentencing was reversed and returned to the trial court for further proceedings. See Leavitt I, 116 Idaho at 294, 775 P.2d at 608. He was resentenced, that was affirmed on November 27, 1991,[8] and certiorari was denied on November 9, 1992.[9] Thus, there are two possible dates, and the parties skirmish over which one should be applied here. While as relevant here I see no substantial change in the legal landscape between the two dates, existing authority already resolves the question as far as the innocence instruction is concerned. That goes to the conviction itself, rather than to sentencing, and the conviction must be deemed final at the end of the appellate proceedings on the guilt phase of the trial. See Brady v. Maryland, 373 U.S. 83, 85 n. 1, 83 S.Ct. 1194, 1195 n. 1, 10 L.Ed.2d 215 (1963); Gretzler v. Stewart, 112 F.3d 992, 1004 (9th Cir.1997).
 
 C. Landscape
 
 125
 Turning to the next element, a court must examine the legal landscape on October 16, 1989, to see if the rule it is asked to adopt was then so clearly established that "a reasonable jurist" would have thought that it was "dictated by [Supreme Court] precedents." Caspari, 510 U.S. at 393, 114 S.Ct. at 955. That is, could it be said that "no other interpretation was reasonable,"[10] so that when Idaho chose not to overturn Leavitt's conviction on account of the innocence instruction, it erred. In that respect, I remain mindful of the fact that a result is not compelled or dictated by Supreme Court precedent simply because it is "within the `logical compass' of an earlier decision." Jones v. Gomez, 66 F.3d 199, 203 (9th Cir.1995).
 
 
 126
 When I survey the landscape through those binoculars, it is drear indeed as far as Leavitt's hopes are concerned. As of that date, the Supreme Court had not said that an instruction like the one at hand violates the United States Constitution. What it had said was that no presumption of innocence instruction need be given. See Kentucky v. Whorton, 441 U.S. 786, 789, 99 S.Ct. 2088, 2090, 60 L.Ed.2d 640 (1979) (per curiam); Taylor v. Kentucky, 436 U.S. 478, 485-86, 98 S.Ct. 1930, 1935, 56 L.Ed.2d 468 (1978). At that time, the circuits were actually split on the issue of whether the instruction was even improper at all. Compare Moffitt v. United States, 154 F.2d 402, 404-05 (10th Cir.1946) with Gomila v. United States, 146 F.2d 372, 373 (5th Cir.1944). The split is not too surprising. The instruction itself can be said to be a harsh or confusing one which suggests that if a person is really guilty, it is not intended that he have the benefit of the presumption. That seems like a somewhat strange suggestion, since guilt, itself, can only be found if the person has been shown to be guilty beyond a reasonable doubt. In any event, the instruction can also be seen as a benign attempt to turn away any thought that there is no reason to place a special burden upon the state in order to protect criminals — a thought that is often popularly expressed — by assuring the jury that the presumption is actually intended to protect the innocent from being improperly convicted, which necessitates that it be applied to everyone.[11] Be that as it may, the division between the circuits still existed some years later. See United States v. Doyle, 130 F.3d 523, 536-37 (2d Cir.1997).[12] The very fact of the intercircuit split militates in favor of a determination that we would be establishing a new rule were we to decide that the instruction in this case violated Leavitt's constitutional rights. See Turner v. Marshall, 63 F.3d 807, 819 (9th Cir.1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677, 685 (9th Cir.1999). So, likewise, does the existence of a significant split among state courts.[13]
 
 
 127
 In so stating, I hasten to add that I am well aware of the fact that by 1989 this circuit had already declared itself to be on the side of those who reject the instruction. See Reynolds v. United States, 238 F.2d 460, 463 (9th Cir.1956). But we did not state that the instruction violated the United States Constitution. In fact, what we did say was: "Since it is right to instruct on the presumption of innocence, it is wrong to add this self-defeating qualification." Id. As we saw it, when the qualification is added to the presumption of innocence instruction, "the result is to leave matters about where they would have been had no instruction on the presumption been given." Id. Of course, as already noted, as far as the Constitution is concerned, if the situation became the same as if no instruction at all had been given, that would be fine. Moreover, Reynolds was a direct appeal case, and a rule announced by us for direct appeal purposes does not translate itself into directives of the Supreme Court for Teague purposes.[14]
 
 
 128
 Also, I am aware of the fact that the presumption of innocence instruction in this case alluded to the beyond a reasonable doubt burden of persuasion. But, in context, that does not make the instruction more or less ambiguous, and does not change the legal landscape as of 1989 in any significant way. In a sense, the two are different sides of the same coin, and courts have not placed weight upon that difference. Rather, they have treated the instruction as one about the presumption of innocence itself. See, e.g., Doyle, 130 F.3d at 533-34 (and cases cited therein); United States v. Bifield, 702 F.2d 342, 350-51 (2d Cir.1983); Moffitt, 154 F.2d at 404-05. I will do the same because, again, I am satisfied that to determine that the offending language violates the Constitution of the United States would create a new rule. That determination is, therefore, barred by Teague. See DelValle, 306 F.3d at 1200.
 
 D. Exceptions
 
 129
 Finally, a court must ask whether the new rule, were it adopted, would come within one of the two Teague exceptions. Those exceptions are: (1) determinations that place private conduct beyond the proscriptive power of the state[15] and (2) those that establish "watershed rules of criminal procedure."[16] Leavitt does not assert that the first of these applies to his case; he could not do so successfully. He does assert that the second exception applies here; I think not.
 
 
 130
 As the Supreme Court has explained, it is not enough that a rule improves trial accuracy; "[a] rule that qualifies under this exception must not only improve accuracy, but also alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding." Sawyer v. Smith, 497 U.S. 227, 242, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990) (citation and internal quotation marks omitted). It is unlikely that it could be said that the presumed-innocence-instruction rule argued for here would meet the bedrock standard. In fact, as the Court has said, it is "unlikely that many such components of basic due process have yet to emerge." Id. at 243, 110 S.Ct. at 2832 (citation omitted).
 
 
 131
 That thought is very relevant because the Court has recently had occasion to reflect upon the retroactivity of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). In Cage, the Court dealt directly with the definition of beyond a reasonable doubt, and decided that the instruction in question there diluted the burden of persuasion enough to amount to a due process violation. Id. at 41, 111 S.Ct. at 329-30. Then, in Tyler v. Cain, 533 U.S. 656, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001), the Court was asked to consider whether its holding in Cage was retroactive to cases on collateral review.
 
 
 132
 While Tyler did not decide the Teague question, it did have some interesting and important ruminations about it. Tyler had argued that still another Supreme Court decision,[17] which said that Cage error was structural, "makes clear that retroactive application [of Cage] is warranted by the principles of Teague ...." Id. at 665, 121 S.Ct. at 2483. Not so, said the Court, because, among other things, no case has held "that all structural-error rules fit within the second Teague exception." Id. at 666, 121 S.Ct. at 2484. "[A] holding that a particular error is structural does not logically dictate the conclusion that the second Teague exception has been met." Id. at 666-67, 121 S.Ct. at 2484. The Court then further discussed Teague, and finished by stating that "it is unlikely that any of these watershed rules `ha[s] yet to emerge.' " Id. at 666-67 n. 7, 121 S.Ct. at 2484 n. 7 (citation omitted).
 
 
 133
 Again, Tyler did not actually decide the issue, but its tenor cannot help but give one pause despite (or, perhaps, because of) the fact that before it was decided, a number of courts of appeals had stated that Cage was, indeed, within the second Teague exception. See Williams v. Cain, 229 F.3d 468, 473 (5th Cir.2000); Tillman v. Cook, 215 F.3d 1116, 1122 (10th Cir.2000); West v. Vaughn, 204 F.3d 53, 55 (3d Cir.2000); Gaines v. Kelly, 202 F.3d 598, 605 (2d Cir.2000); Adams v. Aiken, 41 F.3d 175, 178-79 (4th Cir.1994); Nutter v. White, 39 F.3d 1154, 1157-58 (11th Cir.1994). Tyler does seem to etiolate those holdings. Whether the courts that made them will stay on the same course now that they can see the brume emanating from Tyler is anyone's guess, but, at the very least, a court should be wary and should shy away from the temptation to dub any disapproval of the ambiguous instruction at hand a bedrock rule, even were it to decide that the instruction violates the Constitution.[18]
 
 
 134
 Especially is that true when I reflect upon the fact that many cases have refused to find that instructions which lower the prosecution's burden of persuasion in some respects are within the second Teague exception. That has been notable in the area of so-called Sandstrom[19] error. In Sandstrom, the Supreme Court declared that a presumption instruction was unconstitutional because it lifted from the state's shoulders the burden that it "prove `beyond a reasonable doubt ... every fact necessary to constitute the crime ... charged.'" Id. at 523, 99 S.Ct. at 2459 (citation omitted). Despite that instruction's ultimately baleful effect on the burden of persuasion, most of the federal courts of appeals that have considered the issue have held that Sandstrom error is not within the second Teague exception. See Johnson v. McKune, 288 F.3d 1187, 1200 (10th Cir.2002); Lyons v. Stovall, 188 F.3d 327, 341 (6th Cir.1999); Cain v. Redman, 947 F.2d 817, 822 (6th Cir.1991); Prihoda v. McCaughtry, 910 F.2d 1379, 1382 (7th Cir.1990); contra Hall v. Kelso, 892 F.2d 1541, 1543 n. 1 (11th Cir.1990). Moreover, the same view has been taken of other instructions that allegedly undermine, without entirely overturning, the beyond-a-reasonable-doubt burden that is placed upon the prosecution. See United States v. Mandanici, 205 F.3d 519, 529-30 (2d Cir.2000); Thompson v. Dixon, 987 F.2d 1038, 1043 (4th Cir.1993); see also Willis v. Aiken, 8 F.3d 556, 558, 568 (7th Cir.1993) (confusing instruction).
 
 
 135
 On a continuum, the innocence instruction at hand is closer in effect to the Sandstrom case than it is to the Cage case. That is, assuming that the instruction does inject some ambiguity into consideration of the role of the presumption of innocence, it certainly does not inform the jury that it need not find the defendant guilty beyond a reasonable doubt. Considering the Tyler cloud that Cage retroactivity itself is under, I cannot say that the innocence instruction comes within the second Teague exception.
 
 
 136
 In fine, were I to declare that the ambiguous presumed innocence instruction was unconstitutional and apply it to this case, I would be adopting a new rule in violation of Teague. The district court did just that and, for that reason, I agree that we are required to reverse its decision to issue a writ of habeas corpus on that basis.
 
 II. ALIBI INSTRUCTION
 
 137
 Leavitt asked the trial judge to give an alibi instruction in a particular form. The trial judge complied with his request and, not surprisingly, Leavitt did not object or suggest any changes. Nor did he raise the question on appeal to the Idaho Supreme Court. Yet, by the time he reached the district court he was arguing that the instruction had some defect. The district court said that if the instruction contained an error,[20] that error was invited and, therefore, the Idaho courts would have rejected an appeal based upon it.[21] On appeal Leavitt argues that the district court could not so decide because there is no Idaho doctrine of invited error when it comes to instructions.[22] That claim invites us to commit error.
 
 
 138
 Long ago, the Idaho Supreme Court stated that a defendant who induces the trial court to instruct in a particular manner cannot then argue error on appeal. See State v. Lopez, 100 Idaho 99, 593 P.2d 1003 (1979). In that case, the defendant argued against the giving of an instruction, so the trial court did not give it. Id. at 102, 593 P.2d at 1006. He then tried to argue error on appeal and elicited this response: "The failure of the trial court to instruct on assault with a deadly weapon was caused by defendant's objection and therefore was invited error and will not be considered on appeal." Id. As the court explained in a later case: "The purpose of the invited error doctrine is to prevent a party who caused or played an important role in prompting a trial court to give or not give an instruction from later challenging that decision on appeal." State v. Blake, 133 Idaho 237, 240, 985 P.2d 117, 120 (1999); see also State v. Carlson, 134 Idaho 389, 402, 3 P.3d 67, 80 (Idaho Ct.App.2000). And similarly in a civil case, the court opined that when error was invited by a request for an erroneous instruction, that could not be used to obtain a reversal on appeal. See Laidlaw v. Barker, 78 Idaho 67, 75, 297 P.2d 287, 291 (1956), overruled on other grounds by Crane v. Banner, 93 Idaho 69, 455 P.2d 313 (1969).
 
 
 139
 That authority is the broadside which sinks Leavitt's argument here. He did not merely fail to object to an instruction; he asked that it be given. He cannot now be heard to say that he is entitled to habeas corpus relief because his wishes were acceded to by the trial court.[23] The district court did not err when it rejected this claim.[24]
 
 
 140
 Thus, I respectfully concur in the per curiam opinion.
 
 
 
 Notes:
 
 
 [1]
 In addition, I do not join in footnote 28 of the per curiam opinion because the issues discussed there were not raised at the district court. Had they been, I would agree with their resolution in the per curiam
 
 
 [2]
 The innocence instruction was given with a group of others that explicated the state's burden to prove Leavitt's guilt beyond a reasonable doubt. No serious claim is made that the others, alone or together, violated Leavitt's constitutional rights. Thus, the attack here comes down to an assault on the innocence instruction itself within its overall contextual setting, and it is to that instruction that I, therefore, direct my attention. I take up Leavitt's separate attack on an alibi instruction in part II of this concurring opinion
 
 
 [3]
 However, taking the Idaho Supreme Court at its word, as I must, I presume that it reviewed this claim because it said: "Since the instant case involves a conviction of first degree murder and the imposition of the death penalty, we have carefully reviewed the record for any indication of prejudicial error occurring at trial, regardless of whether or not error has been specifically asserted by the defendant."Leavitt I, 116 Idaho at 288, 775 P.2d at 602.
 
 
 [4]
 We have done the same regarding procedural default issuesSee Windham v. Merkle, 163 F.3d 1092, 1100-01 (9th Cir.1998); cf. Vang v. Nevada, 329 F.3d 1069, 1073 (9th Cir.2003) (state on notice, but did not raise claim).
 
 
 [5]
 Garceau v. Woodford, 281 F.3d 919, 920 (9th Cir.2002), rev'd on other grounds by 538 U.S. 202, 123 S.Ct. 1398, 155 L.Ed.2d 363 (2003).
 
 
 [6]
 Leavitt I, 116 Idaho at 285, 775 P.2d at 599.
 
 
 [7]
 Idaho v. Leavitt, 493 U.S. 923, 110 S.Ct. 290, 291, 107 L.Ed.2d 270 (1989).
 
 
 [8]
 Leavitt II, 121 Idaho at 4, 822 P.2d at 523.
 
 
 [9]
 Leavitt v. Idaho, 506 U.S. 972, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992).
 
 
 [10]
 Lambrix, 520 U.S. at 538, 117 S.Ct. at 1530.
 
 
 [11]
 See, e.g., Turner v. State, 102 Ind. 425, 1 N.E. 869, 870 (1885); State v. Cugliata, 372 A.2d 1019, 1032 (Me.1977), overruled on other grounds by State v. Brewer, 505 A.2d 774, 777 n. 5 (Me.1985); State v. Hanlon, 38 Mont. 557, 100 P. 1035, 1044 (1909).
 
 
 [12]
 Incidentally, while inDoyle the court came down on the side of those who disapprove of the instruction, it expressly declined to decide that its decision would apply to state proceedings on habeas corpus review. Id. at 540 n. 14. Later on, the court declared that the rule was limited to direct review cases. See DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir.2002).
 
 
 [13]
 See, e.g., State v. Schiappa, 248 Conn. 132, 171-72, 728 A.2d 466, 487-88 (1999); State v. Cari, 163 Conn. 174, 180, 303 A.2d 7, 10 (1972) (and cases cited therein); People v. Dowling, 95 Ill.App.2d 223, 228, 238 N.E.2d 131, 133 (Ill.Ct.App.1968); People v. Rees, 268 Ill. 585, 594-595, 109 N.E. 473, 476 (1915); State v. Barnes, 202 Kan. 21, 24, 446 P.2d 774, 776 (1968); State v. Medley, 54 Kan. 627, 39 P. 227, 227 (1895); State v. Gee Jon, 46 Nev. 418, 211 P. 676, 679 (1923).
 
 
 [14]
 Bell v. Hill, 190 F.3d 1089, 1092-93 (9th Cir.1999), is not to the contrary. In that case, we held that a rule we had announced in a previous habeas corpus case bound us in the case then before us. That was not based on Teague; it was based on the binding effect of our own habeas corpus jurisprudence. Nor does Belmontes v. Woodford, 335 F.3d 1024, 1047-48, amended by 350 F.3d 861 (9th Cir.2003) change matters. It, too, relied on an earlier case wherein we had already applied the rule in question to a § 2254 petition, and, while we referred to Teague, the law of the circuit compelled that reliance.
 
 
 [15]
 Lambrix, 520 U.S. at 539, 117 S.Ct. at 1530-31.
 
 
 [16]
 Lambrix, 520 U.S. at 539, 117 S.Ct. at 1531.
 
 
 [17]
 Sullivan v. Louisiana, 508 U.S. 275, 279-81, 113 S.Ct. 2078, 2081-82, 124 L.Ed.2d 182 (1993).
 
 
 [18]
 We have recognized that, in light ofTyler, the second exception of Teague is even more stringent than structural error. See United States v. Sanchez-Cervantes, 282 F.3d 664, 670 (9th Cir.2002); see also Jarrett v. United States, 266 F.3d 789, 791 n. 1 (8th Cir.2001).
 
 
 [19]
 Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
 
 
 [20]
 The district court thought that the instruction was erroneous, but, as I see it, we need not decide that question
 
 
 [21]
 Of course, that is a basis for deciding not to reach the merits of an issue on habeas corpus reviewSee Fields v. Bagley, 275 F.3d 478, 486 (6th Cir.2001); Leverett v. Spears, 877 F.2d 921, 924 (11th Cir.1989); Miller v. Oberhauser, 293 F.2d 29, 31 (9th Cir.1961).
 
 
 [22]
 Aside from his argument about the propriety of the instruction itself, the only other argument made by Leavitt is that when the district court said it would not consider issues procedurally defaulted, it could not thereafter consider invited error. That is an interesting semantic argument, but it is plain that the district court considered invited error to be a separate concept, and I am in no position to tell it that it really meant no such thing
 
 
 [23]
 Leavitt makes an ineffective attempt to save his ship by asserting that the broadside actually fired blanks due toState v. Nunez, 133 Idaho 13, 981 P.2d 738 (1999). That case does not help him. What it says is that where a defendant submits an erroneous instruction which results in his being erroneously convicted of a misdemeanor rather than a felony, the prosecutor cannot have the defendant sentenced for a felony anyway on the basis that the defendant invited the error. Id. at 19-20 & n. 3, 981 P.2d at 744-45 & n. 3. That only suggests that the defendant gets both the benefit and the detriment of his accepted invitations.
 
 
 [24]
 Even if the instruction was constitutionally defective, an issue I see no need to reach, it is plain that any error would be harmless. The only evidence of alibi was Leavitt's own statement, that he was at home watching T.V. which, that starkly put, is not really different from: "I did not do it." Even that, by the way, was significantly impeached. In light of the evidence in this case, and the jury's obvious rejection of Leavitt's stories, it is almost inconceivable that the error had any injurious effect or influence upon the jury's verdict, much less a substantial oneBrecht, 507 U.S. at 638, 113 S.Ct. at 1722; see also California v. Roy, 519 U.S. 2, 4-5, 117 S.Ct. 337, 338, 136 L.Ed.2d 266 (1996).